**WASHINGTON STEEL CORPORATION, a corporation**

v.

**TW CORPORATION, Talley Industries, Inc., B. Paul Barnes, William H. Mallender, Roger S. Carlson, Donald L. Corey, Joseph D. DiSesa, Gerard G. Ellis, Townsend Hoopes, John D. MacNaughton, Emiel T. Nielsen, Jr., Thomas F. Reddy, Jr., Ralph A. Rockow, Fred G. Schuller, Wesley A. Stanger, Jr., John W. Stodder, Marvin A. Pohlman, M. Kimelman & Co., Robert Euler, Michael Kimelman, Joseph E. Giattino, Sheila M. Baird, Oscar Kimelman, and Chemical Bank**

**Chemical Bank, and TW Corporation and Talley Industries, Inc., Appellants.**

**No. 79–1217.**

United States Court of Appeals, Third Circuit.

Argued May 22, 1979.

Decided July 20, 1979.

---

6. *See* Comment, Administrative Inspections, *supra* at 241–46; 14 N.Eng.L.Rev. 119, 127 & n. 70 (1978).

J. Tomlinson Fort (Argued) Charles C. Cohen, Roger C. Wiegand, Kevin P. Lucas, Thomas P. Lawton, III, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellee Washington Steel Corp.; Robert E. Grote, III, Secretary, Washington Steel Corp., of counsel.

Ralph F. Scalera, Joseph D. Shuman, David S. Watson, Thorp, Reed & Armstrong, Pittsburgh, Pa., for appellants TW Corp. and Talley Industries, Inc.; Peter D. McKenna, Wachtell, Lipton, Rosen & Katz, New York City, of counsel.

Harold R. Schmidt (Argued) Karl Alexander, Rose, Schmidt, Dixon, Hasley, Whyte & Hardesty, Pittsburgh, Pa., for appellant Chemical Bank; Ralph L. McAfee, Richard S. Simmons, Gregory A. Markel, Cravath, Swaine & Moore, New York City, of counsel.

Before GIBBONS and HUNTER, Circuit Judges, and MEANOR,* District Judge.

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

In this appeal we consider the limits, if any, imposed by law on a commercial bank which wishes to advance funds to one client in order to facilitate that client's takeover of another of the bank's clients. The appeal is taken from a preliminary injunction prohibiting appellant Chemical Bank (Chemical) from participating in a loan to Talley Industries, Inc., and TW Corporation, its wholly owned subsidiary, (Talley), the proceeds of which were to be used for the purchase by Talley of the outstanding

* Honorable H. Curtis Meanor, United States District Judge for the District of New Jersey, sitting by designation.

shares of stock of appellee Washington Steel Corporation (Washington). Because we take a narrower view than did the district court of the limits on Chemical's lending authority, and because, on the present record, no facts support the trial court's order, we reverse the grant of preliminary relief and remand for further proceedings.

## I. FACTUAL BACKGROUND

On January 15, 1974, Washington executed a credit agreement with Pittsburgh National Bank, Chemical, and Morgan Guaranty Trust Company, pursuant to which the banks agreed to lend Washington up to $10,000,000. Pittsburgh National was the lead bank in that transaction, agreeing to advance 55% of the funds. The credit agreement identified Pittsburgh National as "agent" of the lenders for purposes of the loan. Chemical agreed to advance 22.5% of the funds, or an amount up to $2,250,000. Morgan Guaranty made a similar commitment.

In connection with its participation in the loan to Washington, Chemical received certain information from Washington, some of which was non-public in nature. This information included a May, 1973 Study produced by Washington, providing cash flow and earnings projections for Washington through 1982. In addition, Washington supplied Chemical with quarterly statements of its financial affairs as well as a year-end statement dated December 28, 1978 for the fiscal year ending September 30, 1978.

Besides participating as one of three banks lending money to Washington, Chemical also served as one of two registrars for its common stock. Its function as registrar was to ensure that no more than the authorized number of Washington shares of stock were issued.

Over the years, Chemical has also been the lead bank in loans to Talley. In January, 1979, Talley decided to endeavor to acquire Washington. On or about January 13, 1979, Talley spoke to Paul Fitzgerald, a Vice President at Chemical. Fitzgerald was the principal Chemical liaison to Talley, having worked on four or five Talley loan agreements during the prior seven years. At that time Talley discussed a possible acquisition of an unnamed company. Two days later, on January 15, Fitzgerald met with Talley representatives at the offices of Chemical's legal counsel. ·A discussion was held as to whether Chemical might participate in financing Talley's proposed acquisition of Washington, which was for the first time identified as the proposed acquisition target. An attorney for Talley indicated a belief that Chemical had an ongoing business relationship with Washington. As noted above, this relationship included an outstanding loan agreement and Chemical's service as a registrar for Washington stock.

Later in the day of January 15, Fitzgerald and other members of the Chemical Corporate Banking Department discussed in greater detail the possibility of financing the proposed acquisition. One of the persons attending this meeting was John Roach, District Director for Western Pennsylvania, who supervised the Washington Steel account at Chemical. Roach indicated that there was a loan outstanding to Washington Steel in which Pittsburgh National was the lead bank and Chemical and Morgan Guaranty were participants. Roach also stated that he could not be sure what Washington Steel's reaction would be to the Talley offer. At the conclusion of the meeting, a senior officer of the Chemical Corporate Banking Division made a policy decision that the Bank was not precluded from participating in the proposed loan, assuming that the loan was justified from the standpoint of Talley's creditworthiness.

Thereafter, Fitzgerald and his staff performed a credit analysis of Talley. Concluding that the company was a favorable credit risk, senior credit officials approved the loan commitment. Accordingly, on January 18, 1979, a commitment letter was executed by Chemical and other participating banks confirming the terms upon which each agreed to participate in the Talley loan and setting forth its terms.

By letter delivered on January 19, 1979, Talley communicated to Washington man-

agement and directors its proposal for a merger of the two companies to be accomplished by Talley's paying $36.00 per share of common stock to the shareholders of Washington. This offer was rejected by Washington's management and, by letter of January 23, 1979, notice of the rejection was conveyed to the Washington shareholders.

On January 26, 1979, Talley renewed its offer to merge with Washington, this time proposing to pay $37.50 per share of common stock. In connection with the tender offer, Talley filed a Schedule 14D–1 Statement with the Securities and Exchange Commission. See Section 14(d) of the Securities and Exchange Act of 1934, as added by 15 U.S.C. § 78n(d). In addition, Talley filed a registration statement with the Pennsylvania Securities Commission, in compliance with the Pennsylvania Takeover Disclosure Law, 70 P.S. § 71 et seq.

On January 31, 1979, Washington's management sent a letter to its shareholders urging rejection of the Talley offer. It reiterated this position in a February 1 newspaper advertisement. On February 5, 1979, Washington brought the instant suit in the United States District Court for the Western District of Pennsylvania. In pertinent part, Washington contended (1) that Talley had violated §§ 14(d) and (e) of the Securities and Exchange Act of 1934, as added by 15 U.S.C. §§ 78n(d) and (e) (the Williams Act), by its allegedly inadequate disclosures and deceptive practices in connection with the tender offer, and (2) that Chemical had violated its fiduciary duty to Washington in that it had allegedly misused confidential information obtained from

Washington in deciding to finance the tender offer.[1] Washington sought an injunction to foreclose the tender offer.

Expedited discovery was requested by Washington and was not opposed by Chemical. Washington took depositions of Chemical's officers, and documents were produced by Chemical on February 9, 1979. Three days later, Washington moved for a preliminary injunction.

In the meantime, on February 8, Washington requested a hearing before the Pennsylvania Securities Commission with respect to the proposed tender offer by Talley. On February 13, the Commission Staff issued a report recommending that Washington's request for a hearing be denied. The Staff specifically considered Washington's claim that Chemical had misused the confidential information it had obtained from Washington, and Chemical's affidavits and depositions suggesting that such misuse had not occurred. The Staff noted that Washington submitted no evidence to support its claim of misuse and stated that "[w]ithout any evidence to support Target's position, there is no need to even consider the legal issues." On February 15, 1979, the Pennsylvania Commission issued an order which adopted, in effect, its Staff's recommendations, and denied Washington's request for a full hearing. The Commission found no grounds for delaying the effective date of the Talley tender offer.

## II. THE DISTRICT COURT DECISION

On February 14 and 15, 1979, the district court held a hearing on Washington's mo-

---

1. The first count of the complaint alleged that Talley's January 26 Schedule 14D–1 and Offering Statement violated § 14(d) in that it did not adequately inform, or disclose particular information to the shareholders of Washington; nor did it disclose Talley's relationship with a particular broker-dealer partnership, M. Kimelman & Co. The second count claimed that M. Kimelman & Co. obtained confidential information from plaintiff in the course of various meetings at Washington, and that Chemical used confidential information obtained in the course of its business relationship with Washington in determining whether to arrange financing for the Talley tender offer. The alleged misuse of this information was said to violate § 14(e). In the third count, mislabeled as Count IV in the complaint, Washington alleged that Chemical's purported misuse of confidential information constituted a violation of a common law fiduciary duty. The fourth and final count, mislabeled as Count V in the complaint, alleged that M. Kimelman & Co. misappropriated confidential information. In ruling on the application for a preliminary injunction the trial court did not reach the allegations made in Counts 1, 2, and 4.

tion for a preliminary injunction. On February 16, the court preliminarily enjoined Chemical from participating in the loan to Talley, although it did not enjoin the tender offer. 465 F.Supp. 1100 (W.D.Pa.1979). The court found that, prior to the arrangement with Talley, Chemical "was the agent of the Plaintiff Washington Steel and was purporting to advance the several corporate purposes of Plaintiff Washington Steel at all relevant times, and in particular said Chemical Bank was the transfer agent of Plaintiff Washington Steel." *Id.* at 1103. Moreover, the trial court determined, "Chemical Bank was entrusted with comprehensive, confidential financial information" which "was relevant and pertinent to the formulation of the plan [to take over Washington]" as well as "any proposed financing arrangement" on Chemical's part. *Id.* In view of Chemical's role as "transfer agent" [registrar] for Washington, as well as its receipt of confidential information, the court found that Chemical "was acting as agent for . . . Washington . . and . . . was charged with the responsibility of advancing the best welfare and corporate interests of . . . Washington . . . ." *Id.* at 1104. Chemical thus "had a duty not to act adversely to the interests of . . . Washington," *id.* at 1105, a duty which it breached by participating in a loan to Talley which would ultimately result in the "take over and control [of] all of . . . Washington Steel's assets . . . ." *Id.* Characterizing Chemical's participation in the Talley loan as "egregious and unethical conduct," *id.,* the trial court preliminarily enjoined Chemical from further involvement in the loan to Talley. The court indicated that it was granting the injunctive relief only on the basis of count 3, which alleged a breach of a supposed common law fiduciary duty arising from the receipt of confidential information. *Id.*

## III. DEVELOPMENTS AFTER THE FEBRUARY 16 ORDER

On February 16, 1979, the district court required Washington to post a $2,000,000 bond as a prerequisite to the issuance of the preliminary injunction. *See* Fed.R.Civ.P. 65(c). The bond was to cover "such costs and damages, not exceeding the sum of $2,000,000, as Defendants may sustain by reason of the Preliminary Injunction if the Court finally decides that Plaintiff is not entitled thereto."

Chemical and Talley appealed from the grant of preliminary relief. While the appeal was pending, on March 9, 1979, Washington received an offer of $40 per share from WS–B, Inc., a wholly-owned subsidiary of Blount, Inc. On March 12, a report over the Dow Jones broadtape indicated that Talley had withdrawn its tender offer for Washington stock.

## IV. MOOTNESS

The withdrawal of the Talley tender offer raises the preliminary question whether this appeal is now moot. We hold that it is not. Appellants have expressed an interest in pressing a claim to recover damages on the injunction bond. They have pointed to specific costs that they have incurred as a consequence of the preliminary injunction, and have correctly noted that, when their claim on the bond is before the trial court, the very issues presently before us will once again be raised. Because we would eventually be called upon to consider those issues on an appeal from the disposition of the bond claim, this present appeal is not moot.

We considered a similar situation in *American Bible Society v. Blount,* 446 F.2d 588 (3d Cir. 1971). There, mailers of books brought actions against the Postmaster General and local postmasters seeking to enjoin the enforcement of a regulation requiring mailers to sort and sack material as a condition to eligibility for preferential fourth class rates. After preliminary injunctions were granted and security posted, the district court denied motions for an increase in security. The court did so on the ground that an interim change in the applicable postal regulations rendered the suits moot. The district court later granted plaintiffs' motions for an order dismissing

the actions without prejudice and without costs and discharging the bonds. This court reversed. In so doing, we expressly rejected the contention that the case was moot. "[I]f we dismiss the action," we stated, "the Post Office Department will in all likelihood institute suit against the sureties at some future time and, in any such action, the court will be faced with deciding the same issues that are in contention here." *Id.* at 594. We noted that it has long been recognized "that a case is not moot if there is a reasonable likelihood that the parties or those in privity with them will be involved in a suit on the same issues in the future." *Id.* at 595. Judicial economy and vigorous advocacy both being assured, we concluded that we should consider the plaintiffs' contentions. *Id.* at 595–96. In the end we remanded the case for further proceedings on the merits. Id. at 598. More recently, in *Klein v. Califano,* 586 F.2d 250 (3d Cir. 1978) (en banc), we reiterated this principle. In *Klein,* we held that the possibility that HEW might sue for recoupment of funds which were paid out under a preliminary injunction alleged to have been wrongfully issued saved from mootness the appeal of the merits of the injunction. We expressly applied the reasoning of *American Bible Society.*

Here, Talley and Chemical are in a position to sue on the bond and, if after final judgment it is clear that the preliminary injunction was wrongfully ordered, they can collect damages. *See American Bible Society,* at 594–95 & n.12 ("No liability can arise on an injunction bond unless there is a final judgment in favor of the party enjoined"). Accordingly, the appeal is not moot. *See also Liner v. Jafco, Inc.,* 375 U.S. 301, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964); *NAPA Pittsburgh, Inc. v. Automotive Chauffeurs, L.U. # 926,* 502 F.2d 321, 322 n.1 (3d Cir. 1974) (en banc), *cert. denied,* 419 U.S. 1049, 95 S.Ct. 625, 42 L.Ed.2d 644 (1975).

## V. THE MERITS

The trial court granted the preliminary injunction on the ground that Chemical had violated a common law fiduciary duty to Washington. While the court's opinion did not make clear its precise origins or nature, Washington urges two possible theories in support of such a duty. First, it maintains that Chemical, by receiving confidential information in connection with its loan to Washington, impliedly assumed a duty not to act on behalf of another company whose purpose was to "subver[t] . . . Washington Steel's . . . capital development program . . . ." Second, Washington urges that even if there is no such *per se* rule which forbids a bank in Chemical's position from advancing the efforts of one client to merge with another, nonetheless there is a duty, which Chemical violated, not to misuse confidential information supplied by the target company.

### A. The Per Se Fiduciary Duty

The trial court ruled that, as a matter of law, Chemical "had a duty not to act adversely to the interests of Plaintiff Washington Steel under the circumstances. . . ." As noted above, the court seemed to derive this duty from Chemical's role as a registrar of Washington stock as well as from its receipt of information supplied by Washington in connection with a commercial loan. On appeal Washington does not rely on Chemical's role as registrar in urging a *per se* fiduciary duty.[2] Rather, it contends that, having entrusted Chemical with the May, 1973 Study projecting future earnings as well as periodic financial reports, Washington reasonably expected Chemical to take no actions adverse to the continued viability of the Company. Whatever expectations it may have entertained, however, we cannot fairly imply a duty whose sweep is as broad and whose restrictions are as severe as that urged by Washington.

We note at the outset that the case law adduced by Washington lends no support to the fiduciary duty it proposes. For exam-

2. In any event, for the same reasons that we reject the implication of a *per se* fiduciary duty from a bank's receipt of confidential informa- tion, we would reject inferring such a duty from its role as registrar for a company's stock. *See* pp. 600–601 *infra.*

ple, for the proposition that fiduciary duties between banks and their customers may be broadly and flexibly implied by courts, it quotes the decision in *M. L. Stewart & Co. v. Marcus,* 124 Misc. 86, 207 N.Y.S. 685 (Sup.Ct.N.Y.Cty.1924), wherein a New York court declared:

> The jurisdiction exercised by courts of equity over the dealings of persons standing in certain fiduciary relations has always been regarded as one of a most salutary description. The principles applicable to the more familiar relations of this character have been long settled by many well-known decisions, but *the courts have always been careful not to fetter this useful jurisdiction by defining the exact limits of its exercise.*

207 N.Y.S. at 689 (quoting *Tate v. Williamson,* L.R. 2 Ch.App. 55, 60) (emphasis added by Washington Steel). In fact, however, *M. L. Stewart* has little, if anything, to do with the issues at stake here. In that case M. L. Stewart & Co. (Stewart) and another company were bidding on some property; defendant Marcus, a bank officer, was representing the second company in the negotiations. Both bidders were depositors in the bank. One day, an officer of Stewart informed Marcus that Stewart had won the bid and wondered if it could count on the bank for a loan. Marcus agreed. Before making the loan, however, Marcus learned that Stewart had not won the bid. Accordingly, on behalf of the second company, Marcus bid successfully for the property. Stewart brought suit, claiming that its having asked for a loan created a fiduciary relationship with the bank, which relationship Marcus breached by placing the winning bid. The court *rejected* plaintiff's contention. It noted that while fiduciary relationships (called "constructive trusts" by the court) will occasionally be imposed by courts regardless of the intentions of the parties, generally courts will try "to harmonize the necessities of a competitive industrial system of business with the teachings of morality." 207 N.Y.S. at 691. The mere fact that plaintiff was depositor was irrelevant, *id.* at 692; essential in discerning any trust relationship, the court declared, is

whether the revelation of a party's confidence was made on an understanding of trust. In this instance, the court felt that since Stewart's "revelation"—that he had won the bid—was false, no trust relationship emerged. *Id.* at 693.

To the extent that *M. L. Stewart & Co.* is apposite at all, it undercuts Washington's proposed *per se* rule of fiduciary duty. The New York court, after all, sought to "harmonize the *necessities of a competitive industrial system of business* with the teachings of morality." *Id.* at 691 (emphasis added). Here, Washington urges a rule that, as we suggest below, might undermine the very economic necessities to which the *M. L. Stewart* court referred.

Washington's other case citations, also intended to draw a fiduciary rabbit from a commercial loan agreement hat, are similarly inapposite. Indeed, the only case to have actually considered the legal issues raised by Washington has squarely rejected identical contentions. *See American Medicorp, Inc. v. Continental Illinois Nat'l Bank,* No. 77 C 3865 (N.D.Ill. Dec. 30, 1977) (reproduced in Appendix, at 1006–18a). In that case, American Medicorp sought to forestall efforts by Humana, Inc. to acquire its outstanding common stock. Toward that end, American Medicorp moved to enjoin Continental Bank from financing the proposed Humana tender offer. American Medicorp pointed out that Continental had lent it money over the years, performed "other banking services," and, in the course of these dealings, "acquired a file of 'non-public' financial and other information furnished by the plaintiff." Appendix, at 1007a. American Medicorp contended that "making a loan to a company which desires to take over the control of one of Continental's customers which has supplied confidential data to the bank is a *per se* breach of a fiduciary obligation which should be enjoined." *Id.* at 1008a. The district court rejected this contention, noting that plaintiff had failed to come forward with a single case "supporting a complete prohibition against lending money to a company seeking to take over one of the bank's cus-

tomers which has provided it with 'non-public' information." *Id.* at 1011a. The court noted that "[d]espite the stringent governmental regulations to which Federal banks are subject today, this limitation has not been imposed." *Id.* at 1011a–12a.

We agree with the court in *American Medicorp.* Not only is the *per se* rule urged by Washington wholly unprecedented, but, in addition, its application is objectionable on important policy grounds. To imply a common law fiduciary duty of banks not to deal with competitors of their borrowers, or even just potential acquirers of those borrowers, could wreak havoc with the availability of funding for capital ventures. *See* Note, *Bank Financing of Involuntary Takeovers of Corporate Customers: A Breach of a Fiduciary Duty?*, 53 Notre Dame Lawyer 827, 835 (1978). Companies seeking to insulate themselves from takeovers, or even from ordinary competition, could simply arrange for a series of loans from most of the major banks, supplying those banks with the requisite non-public information. Under the *per se* rule urged by Washington, the banks would thereby be foreclosed from financing competitors and potential acquirers of the borrowing firms. As the *American Medicorp* court recognized, such a result "would tend to burden the free flow of bank financing and the ability which a bank now has to deal with customers who may have adverse interests to other customers." Appendix at 1017a.

Moreover, even if the rule Washington proposes were sound public policy, it would hardly be the province of this court to say so in the context of this present litigation. First, establishing a *per se* common law fiduciary duty of banks to their borrowers seems archetypically within the domain of legislative judgment. A legislature is best suited to consider the delicate financial issues at stake and strike the appropriate balance between sound economics on the one hand, and expectations of loyalty on the other. In addition, even were we to presume to venture into this area, we would be reluctant to do so as a matter of state common law, as the trial court apparently did and as Washington urges on appeal. Given the need for uniform rules in an area so vital to our national economy as banking, any state common law rule that we might imply would likely give way to the preemptive force of federal law. *Cf. Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943) (need for uniformity in issuance of United States commercial paper precludes application of state law to issue of timeliness of notification of forgery). Moreover, there is every reason to believe that Congress is aware of this issue and has begun the difficult process of effecting a legislative solution.[3] In addition, the Comptroller of the Currency has recently proposed a regulation for national banks which suggests ways of restricting the use of confidential information obtained from one client on behalf of another. *See* Proposed Treas.Reg. § 9.7(d), 42 Fed.Reg. 56,338 (1977), *reprinted in* Herzel & Colling, *The Chinese Wall and Conflict of Interest in Banks,* 34 Bus.Law. 73, 100 (1978). The Board of Governors of the Federal Reserve System has adopted a similar statement for state member banks. *See* 43 Fed.Reg. 12,755 (1978), *cited in* Herzel & Colling, *supra,* at 100. These developments evince a concern at the national level with the issues raised by Washington. Any common law fiduciary duty which we might imply would, in all probability, have to yield to whatever national policies might emerge from these deliberations.

Accordingly, we reject the contention that Chemical, having received confidential information from Washington in connection with its participation in a loan to that company, was necessarily precluded from financing the efforts of Talley to merge with Washington.

### B. *The Misuse of Confidential Information*

■ Besides urging a *per se* rule of fiduciary duty, Washington supports the preliminary injunction on the theory that Chemical allegedly misused Washington's confi-

---

**3.** *See* N.Y. Times, June 11, 1979, D1, col. 1, D6, col. 3.

dential information in arranging the loan to Talley. We note at the outset that the trial court did not make an express finding that such misuse occurred. Rather, the order and accompanying recitals seem to suggest that the mere receipt by Chemical of confidential information is, without more, a sufficient basis for enjoining its participation in the loan to Talley. We have rejected this position in V–A above. Nevertheless, since a prevailing party can support a district court judgment on any ground, including ones overlooked or rejected by the trial court, see *Dandridge v. Williams,* 397 U.S. 471, 475 n.6, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *United States v. American Ry. Exp. Co.,* 265 U.S. 425, 435–36, 44 S.Ct. 560, 68 L.Ed. 1087 (1924); *see also* Note, *Federal Jurisdiction and Procedure—Review of Errors at the Instance of a Non-Appealing Party,* 51 Harv.L.Rev. 1058, 1059–60 (1938), we will consider in this appeal Washington's contention that misuse of confidential information took place and justified the issuance of the preliminary injunction.

As an initial matter, it is important to note that Washington has not contended, and the trial court did not hold, that Chemical relayed any confidences to Talley. Count 3 of appellee's complaint, on the basis of which the preliminary injunction issued, charges Chemical with liability for using confidential information obtained from Washington Steel in connection with its *own* decision to participate in the loan to Talley. Washington reiterates that position on appeal. Accordingly, we have no occasion at this time to decide whether a bank which actually provides one client with confidential information obtained from and concerning another client may be enjoined from financing the former client's takeover of the latter.

■ We turn, therefore, to the remaining questions, whether the Chemical officers in evaluating the loan to Talley used confidential information obtained from Washington, and, if so, whether such use was ground for a preliminary injunction. Washington contends that Chemical should be deemed to have used the information, offering two

arguments in support of this position. First, it urges that we adopt a presumption of such use because, given Talley's allegedly weak financial picture, Chemical officers would have had particularly strong reasons to inquire into Washington's financial position and thus to avail themselves of confidential information supplied by Washington. Second, Washington claims that actual use of information did occur, in that Mr. Roach—the Chemical officer in charge of the Washington Steel account—said nothing at the January 15, 1979 meeting at which the loan to Talley was discussed. From Roach's silence, Washington argues, the other officers could have inferred that the target was a wise investment. Washington asserts, finally, that Chemical's use of this confidential information in making its own decision on the Talley loan was unlawful.

We do not accept Washington's contentions. There was, first of all, no showing that those Chemical officers who were involved with the loan to Talley made any use of the information provided by Washington. We refuse to presume such use on the unsupported assumption that, in view of Talley's ostensibly weak financial condition, Chemical would not have decided to make the loan to Talley had it not known of Washington's assertedly bright future. All the evidence on this record suggests otherwise; it was Talley's, and not Washington's financial standing that encouraged Chemical to move ahead. Chemical was "eminently familiar with Talley," having "done business with them for years." Appendix, at 485a. Chemical performed a "worse-case" analysis of Talley's ability to repay the loan. *Id.* at 489a. That analysis convinced Chemical of Talley's ability to cover its debt service. *Id.* at 491a. In performing that analysis, Chemical considered only Washington's current dividend payout; it made no assumptions about a change in Washington's dividend rate. *Id.*

Roach's silence at the January 15 meeting does not alter this conclusion. What more, after all, could Roach do at that meeting to safeguard the information? The evidence

establishes that Roach said nothing at the meeting beyond the fact that there was a loan relationship with Washington and that he did not know what Washington's reaction to the Talley offer would be. Appendix, at 477a–79a. Moreover, Mr. Fitzgerald testified that his staff was instructed not to talk to anyone who worked on the Washington account, nor was it to look at any files kept on the target company. *Id.* at 481a. Fitzgerald himself had no access to Washington files. *Id.* at 482a. Indeed, both Roach and his assistant John Watkins submitted affidavits stating that they had personally secured all of the Washington files and kept them out of the possible sight of those persons working on the Talley loan. *Id.* at 960–63a. Thus we do not share appellee's view that Chemical used the Washington information in deciding to make the loan to Talley.[4]

But assuming, arguendo, that such use occurred, we reject for a more fundamental reason Washington's contention. We do not believe that a bank violates any duty it may owe to one of its borrowers when it uses information received from that borrower in deciding whether or not to make a loan to another prospective borrower. First, like the *per se* rule adopted by the trial court and discussed above, the promulgation of a rule restricting the dissemination of confidential information within the loan department of a bank is neither the proper province of a court nor an appropriate subject for state law adjudication. More critically, the adoption of such a rule would make unwise banking policy. To prohibit a bank from considering all available information in making its own loan decisions might engender one or both of two undesirable outcomes. First, it might force banks to go blindly into loan transactions, arguably violating its duties to its own depositors. Alternatively, such a rule might discourage banks from lending money to any company which expresses an interest in purchasing shares of stock of another of the bank's customers. The adverse implication of this result for the free flow of funds is precisely the reason why we rejected the *per se* rule urged by Washington. Bank credit is, after all, the largest part, by far, of the national money supply.

■ Of course, we intimate no view on whether a bank may be foreclosed from disseminating confidential information to a *separate* bank department, such as the trust department, whose function it is to recommend particular investments to its clients. Such dissemination of insider information arguably might violate Section 10(b) of the Securities and Exchange Act of 1934 and the S.E.C.'s rule 10b–5. 17 C.F.R. 240.10b–5. *See* Herzel & Colling, *supra*, at 86; Lipton & Mazur, *The Chinese Wall Solution to the Conflict Problems of Securities Firms,*

**4.** Chemical and Talley have called our attention to the prior finding of the Pennsylvania Securities Commission, noted p. 597 *supra*, that no misuse of confidential information occurred. Conceivably, this finding might collaterally estop Washington from asserting anew its claim that Chemical misused the information provided by Washington. A federal court must give prior Pennsylvania adjudications whatever estoppel effect a Pennsylvania state court would give them. *See* 28 U.S.C. § 1738. Recognition of state determinations is especially important where, as here, the underlying cause of action—an asserted common law fiduciary duty—is itself governed by state law. While Pennsylvania does not seem to give complete estoppel effect to decisions of administrative agencies, *see, e.g., DeAngelis Liquor License Case,* 183 Pa.Super. 388, 398 & nn.5, 6, 133 A.2d 266, 271 & nn.5, 6 (Super.Ct.1957) (citing cases), it does accord them a large measure of deference. *See, e.g., McAllister Unemployment*

*Compensation Case,* 197 Pa.Super. 552, 554–55, 180 A.2d 121, 122 (Super.Ct.1962). Thus, had the findings of the Pennsylvania Securities Commission been affirmatively pleaded by appellants in the district court, the trial judge might well have been obliged to treat them with similar deference.

There is no showing, however, that appellants affirmatively raised in the trial court the estoppel effect of the Commission's determination. While state law governs the substantive estoppel question, Fed.R.Civ.P. 8(c) controls the manner in which estoppel may be raised in federal court. *See Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). Rule 8(c) requires a party to plead estoppel as an affirmative defense. Since appellants do not appear to have so raised the issue, they are not entitled in this appeal to the benefits of collateral estoppel. For the reasons expressed elsewhere, however, this conclusion does not appreciably strengthen Washington's position.

50 N.Y.U.L.Rev. 459, 475 (1975). So, too, might the dissemination of such information to the acquiring company itself. Neither of these issues, however, is presented in this appeal. We deal solely with dissemination within the commercial loan department. That is another matter entirely. In making loans, unless it is to take imprudent risks with the funds on deposit with the bank, the commercial loan department must be free to make full use of the information available to it. If, for example, a competitor of a borrower seeks a loan for a purpose which the loan department knows, from information in its files supplied by that borrower, is preordained to failure, it should hardly be permitted, let alone required, to ignore the information, finance a foolhardy venture, and write off a bad loan. Thus, we hold only that the use within that loan department of information received from one borrower, in evaluating a loan to another borrower, does not, without more, state a cause of action against the bank.

## VI. CONCLUSION

The preliminary injunction from which Talley and Chemical have appealed will be reversed. Since Chemical's alleged liability derived from the trial court's *per se* rule or, alternatively, from Washington's claim of misuse of confidential information, our rejection of those theories forecloses any relief against Chemical. Thus, Chemical may, on remand, recover on the injunction bond any damages it can prove. The preliminary injunction also restrained Talley from accepting funds from Chemical. While the legal theories pressed on this appeal do not support that restraint, we note that the trial court has not yet ruled on Washington's allegations of Talley's liability under the Williams Act, 15 U.S.C. §§ 78n(d) and (e). Liability under those sections might have foreclosed Talley from effecting the actual takeover once the loan from Chemical was finalized. As a result, certain of the costs allegedly incurred by Talley because of the erroneously issued preliminary injunction—specifically, the inability to consummate the takeover—might have been incurred anyway. The extent of Tal-

ley's recovery on the bond must therefore await a final resolution of those outstanding issues. Accordingly, the case is remanded for further proceedings not inconsistent with this opinion.