Louis H. MARRERO, IV

v.

BANCO di ROMA (CHICAGO).

Civ. A. No. 79–2344.

United States District Court,
E. D. Louisiana.

April 8, 1980.

Arthur A. Lemann, III, New Orleans, La., David P. Seikel, Houston, Tex., for plaintiff.

George W. Pigman, James P. Farwell, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for defendant.

SEAR, District Judge.

In April, 1976 Wilson P. Abraham sold plaintiff Louis H. Marrero IV 305,306 shares of stock in the International City Bank (ICB). The total purchase price was $3,511,019, of which Marrero paid $750,000 in cash. For the balance he executed a personal promissory note to Abraham for $861,109 and assumed Abraham's existing $1.9 million debt with defendant Banco di Roma—Chicago (Banco). Abraham had originally made a loan of $1.9 million in May, 1975 with Mutual Benefit Life Insurance Co. of Decatur, Alabama in order to purchase those shares and later refinanced that loan through Banco.

Soon after the sale the ICB failed and the stock became virtually worthless. Marrero filed suit against Abraham in September, 1976 under Rule 10b–5 and various provisions of Louisiana law, alleging that Abraham had induced him to purchase the stock through a series of misrepresentations and omissions.[1] In late 1978 the parties learned through discovery that a time deposit of $1.9 million by Taro Anstalt, Vaduz (Taro), a Liechtensteinian corporation, secured Marrero's loan with Banco and had secured Abraham's loan prior to that, although neither Marrero nor Abraham had known of the deposit. Moreover, Luciano Ricci, a vice-president of Banco, testified during deposition that he would not have proposed the loan but for the additional security. Based upon this evidence Abraham filed a third-party complaint for indemnity, and in the alternative, contribution, against Banco and several others, including Taro, Inter-Financing Exchange, S.A., Artfer, Inc., Mississippi River Grain Elevator, Inc., and Serafino Ferruzzi, an Italian citizen who had a substantial interest in the last two mentioned companies. Abraham alleges that these parties conspired to defraud Marrero by making financing available without disclosing that $1.9 million was deposited as security for the loan, thus inducing him to purchase the ICB stock. It is further alleged that had Marrero known of the time deposit, he would have neither accepted the loan nor purchased the stock.[2]

During all of this activity Marrero took no action because of the existence of a Forebearance and Extension Agreement executed with Banco on August 10, 1978. In that agreement each side agreed not to bring suit against the other before June 30, 1979 for any cause of action arising out of the loan. In return, Banco was to receive a 54.1% share of any proceeds of the Marrero-Abraham suit. On June 29, 1979, having in the meantime discovered the existence of the Taro deposit, Marrero filed this suit against Banco, asserting various misrepresentations and omissions by Banco that all revolve around one allegation—Banco's failure to notify Marrero that his $1.9 million loan was secured by a $1.9 million time deposit. Marrero asserts a cause of action for damages under § 10b–5, 17 C.F.R. § 240.10b–5; and § 17 of the Securities Act, 15 U.S.C. § 77q. He also requests a declaratory judgment that the note with Banco is void due to violations of § 7 of the Securities Exchange Act, 15 U.S.C. § 78g, and Regulation U, 12 C.F.R. § 221, promulgated thereunder; Rule 10b–5; § 12(2) of the Securities Act, 15 U.S.C. § 77*l*(2); § 17 of the Securities Act; the Louisiana Blue Sky Law, La.R.S. 51:715 A (3); and the fraud and redhibition articles of the Louisiana Civil Code.[3] Finally, Marrero asks for a declaration that the Forebearance Agreement is void because it was entered into as the result of fraud in violation of the Louisiana Civil Code.

Banco moves to dismiss all claims brought against it by Marrero under Rule 10b–5, Regulation U and the Louisiana Blue Sky

---

1. *Marrero v. Abraham*, C.A. 76–2891 "G", E.D.La. This suit as originally filed did involve other defendants, but all except Abraham have now been dismissed.

2. Banco, Artfer and Mississippi River Grain Elevator brought a Motion to Dismiss the Third-Party Complaint, which I granted as to the indemnity claim and denied as to the contribution claim.

3. La.C.C. Arts. 1819, 1824, 1847, 1893, 2315, 2541 and 2544.

Law.[4] The motion was argued on March 12, 1980, at which time it was taken under submission. Both sides have now submitted post-argument memoranda, and it is ripe for determination.

## I. The Rule 10b–5 Claim [5]

Banco offers a series of reasons why the complaint fails to state a claim under Rule 10b–5:

(1) The Marrero-Banco loan was a "commercial loan" and so not covered by Rule 10b–5.

(2) Mere silence, which is all that is alleged, is not a violation of Rule 10b–5.

(3) Banco owed a fiduciary duty to Taro not to disclose the pledge.

(4) Banco had no duty to see that Marrero was not misled by others, such as Abraham.

None of these arguments warrant dismissal of the complaint at this stage of the litigation.

### A. The Significance of the "Commercial/Investment" Distinction

■ Banco argues that its loan to Marrero was a commercial, and not an investment transaction, thus taking it outside the scope of the securities laws. It relies on a line of Fifth Circuit cases in which the court distinguished normal commercial loans from loans whose circumstances justified characterizing them as investment transactions. In each case the court held that the former fell outside the purview of Rule 10b–5. *McClure v. First National Bank of Lubbock, Texas*, 497 F.2d 490 (5 Cir. 1974), *Bellah v. First National Bank of Hereford*, 495 F.2d 1109 (5 Cir. 1974), *National Bank of Commerce of Dallas v. All American Assurance*

*Co.*, 583 F.2d 1295 (5 Cir. 1978). Marrero responds that those cases, whatever their merits, are inapposite since he does not claim that his note with Banco constitutes a security. Rather, his complaint alleges that the loan was made "in connection with" the sale of ICB stock by Abraham, and he claims that this allegation is sufficient to satisfy the requirements of the rule.

In order to evaluate these arguments properly, it is first necessary to review the categories of persons whose conduct has traditionally been considered covered by Rule 10b–5. In *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 94 (5 Cir. 1975), the Fifth Circuit divided Rule 10b–5 defendants into two general categories, "primary" and "secondary". It placed only actual purchasers and sellers in the first category, while the second category included all others with some nexus or "legally cognizable relationship" to the plaintiff, such as corporate insiders, tippers and tippees, consultants, conspirators, and aiders and abettors. Banco was not a purchaser or seller of ICB stock, nor is it alleged that it in any manner attempted to aid Abraham in the commission of his alleged fraud. Banco fits within none of the usual classes of secondary 10b–5 defendants. Rather, the allegations against Banco attempt to place it within a new class of secondary defendants—those non-insiders who allegedly misrepresent or omit material facts during the course of a securities sale for their own purposes, acting independently of both the seller and the purchaser.

The above discussion demonstrates that the investment-commercial cases have no application here, for Marrero makes no claim that Banco is liable as a primary

---

4. Banco admits that Marrero has stated a claim under the fraud and redhibition articles of the Civil Code.

5. Rule 10b–5 provides:
 "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

violator of Rule 10b–5.[6] A new type of secondary liability is alleged, and the important question is whether the Banco loan was sufficiently connected to the plaintiff's purchase of ICB stock to justify the application of the rule. In short, were Banco's actions, particularly the non-disclosure of the Taro deposit, made "in connection with" the purchase or sale of a security?

The issue is one of first impression, for no court has ever faced allegations quite like those made in this case.[7] I must therefore return to the language of the rule itself, which is quite broad, proscribing any material misrepresentation, omission or other fraudulent act made in connection with the purchase or sale of any security. Moreover, the Fifth Circuit has given this language an expansive interpretation.

> [The "in connection with" requirement] receives a broad reading and is satisfied by the showing of a nexus between the defendant's actions and plaintiff's purchase or sale . . . Sometimes this requirement is expressed in terms of causation; *List v. Fashion Park, Inc.*, 340 F.2d 457 (2 Cir. 1964), looked to "whether the plaintiff would have been influenced to act differently than he did if the defendant had disclosed to him the undisclosed fact." 340 F.2d at 463.

*First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1315 (5 Cir. 1977). See also *Sargent v. Genesco, Inc.*, 492 F.2d 750, 763 (5 Cir. 1974). Marrero has alleged that had Banco disclosed the Taro deposit, he would not have purchased the stock from Abraham. This would appear to satisfy the "in connection with" test as set forth in *Benson*.

Nonetheless, Banco contends that the sale and the loan must be considered as separate transactions and that therefore no activity concerning the loan is actionable under Rule 10b–5 unless the loan itself constituted an investment transaction. As support for this contention it cites *Crabtree Investments, Inc. v. Aztec Enterprises, Inc.*, 479 F.Supp. 448 (M.D.La.1979). In that case there were two plaintiffs, Crabtree Investments, Inc. and its sole shareholder, John Crabtree. The company purchased stock from the defendant, while at the same time John Crabtree agreed to execute a continuing guaranty agreement covering loans to be made to Aztec. Both plaintiffs subsequently filed claims under Rule 10b–5 in which they contended that Aztec had materially misrepresented its financial condition prior to these transactions. Judge Parker held that the individual's claim failed to state a cause of action.

> "Plaintiffs argue that a continuing guaranty agreement is commonly known as a 'security' agreement and therefore falls within the statutory definition. It is correct that a continuing guaranty agreement is frequently considered as a 'security device' in that it secures the obligation of another, but it is clearly not an 'investment contract' within the meaning of the statute. Plaintiffs urge that the Court consider the jurisprudence that it is the 'economic reality' of the transaction rather than the particular form to which the Court should look. See *S. E. C. v. Howey*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946); *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979). While

**6.** It is noteworthy that in the commercial/investment cases, none of the loans in question were used for the purchase of securities. Thus, in none of these cases did the Fifth Circuit have occasion to consider the precise issues presented by Marrero's allegations against Banco.

**7.** The facts in *First Virginia Bankshares v. Benson*, 559 F.2d 1307 (5 Cir. 1977), are somewhat similar to those presented here. Heller, one of the defendants in that case, was held liable under Rule 10b–5 although plaintiff had not specifically alleged any theory of secondary liability. However, Heller did have a long-

standing business relationship to the seller of the stock, who was also a defendant, and the court's opinion implies that it considered Heller to have been a corporate insider who acted on the basis of inside information not available to the purchaser. *Id.* at 1317. There is no contention made here that Banco had any "insider" relationship with Abraham, although it is true that it refinanced the loan which enabled him to purchase the ICB stock later sold to Marrero. Therefore, *Benson* does not determine the outcome here.

the various aspects of the Aztec affair may have constituted one scheme or plan, there are several distinct transactions involved. When the 'economic realities' are viewed, all the parts do not involve 'securities' as defined by 15 U.S.C. § 78c(10). Specifically, Crabtree Investments made an investment of money in a common enterprise with profits to come solely from the efforts of others when it bought 2,000 shares of Aztec. On the other hand, Crabtree individually did not make an investment of money in a common enterprise with profits to come solely from the efforts of others when he signed a personal continuing guaranty of Aztec's obligations. Plaintiffs do not set forth in the supplemental and amended complaint a 10b–5 claim on behalf of Crabtree individually."

*Id.* at 451.

·*Crabtree* is distinguishable from this case. John Crabtree, whose claim was dismissed, never purchased any Aztec stock, and the court rejected his argument that the guaranty agreement constituted a security under the investment/commercial test. Therefore, despite the fact that the sale and the guaranty agreement were executed at the same time, he lacked standing to file suit under Rule 10b–5 because he had not purchased or sold any securities. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). The instant case involves only one plaintiff who, unlike John Crabtree, did purchase some securities. The problem faced by the court in *Crabtree* does not arise in this factual context. Marrero has alleged a causal connection between Banco's conduct and his purchase from Abraham, which is all he need do to satisfy the "in connection with" requirement. Therefore, this first argument made by Banco must fail.

B. The Duty to Disclose

■ A closely related issue is whether Banco owed Marrero any duty to disclose the existence of the Taro deposit. In order for mere silence to be actionable under Rule 10b–5, there must exist some relationship of trust and confidence between the parties giving rise to a duty to disclose. *Chiarella v. United States*, —— U.S. ——, 100 S.Ct. 1108, 63 L.Ed.2d 384 (1980). Factors to be considered in ascertaining whether such a relationship exists include the parties' relative access to the information, the benefit to be derived by the defendant from the sale, defendant's awareness of plaintiff's reliance on him in reaching his investment decision, and defendant's role in initiating the purchase or sale. *Benson, supra,* 559 F.2d at 1314. Banco contends that since the Fifth Circuit found that no duty to disclose existed in *Woodward v. Metro Bank of Dallas, supra,* a case with facts similar to the allegations made here, dismissal of this suit is proper.

In *Woodward* the plaintiff was persuaded to come to the aid of a failing company named CIC. The president of CIC, Starnes, induced her to co-sign a $200,000 note, which was secured by $185,000 of stock which she owned. The loan was renewed, and a few months later CIC failed. Starnes declared bankruptcy, and Woodward then sued the bank which lent CIC the $200,000 under Rule 10b–5 as an aider and abettor of fraud allegedly committed by Starnes. She claimed that the bank's failure to disclose certain facts about CIC's precarious financial condition at the time of the loan violated the rule.

The Fifth Circuit assumed for purposes of argument that the note was issued for investment purposes (so that it was a security to which Rule 10b–5 applied) and then discussed whether the bank's actions violated the rule. It held that the evidence at trial failed to show that the bank had any duty to disclose the disputed information to the plaintiff. 522 F.2d at 99. However, the court was careful to state that its holding was fact-specific and that under different facts, it "would not hesitate to hold a bank to account." *Id.* at 100.

■ Because the *Woodward* court relied on the specific facts presented to it following a trial on the merits, the case is not a sufficient basis for holding that a bank's failure to disclose material facts in connec-

tion with a sale of securities is never actionable under Rule 10b–5. The existence of a duty to disclose cannot be determined in this case without a fuller presentation of the relationship between Marrero and Banco. *Woodward* indicates that Marrero may have a difficult time proving that such a duty existed, but it does not bar the attempt.

 Moreover, when one undertakes to say anything in connection with a sale of securities, a concomitant duty arises to speak the whole truth. *Benson, supra,* 559 F.2d at 1317. In his complaint plaintiff alleges that Banco intentionally misrepresented to him that only the ICB stock was pledged as security for his loan.[8] In particular, he claims that a document called Form U–1, which was executed pursuant to Regulation U as a disclosure of all security, contained various errors and omissions, including the omission of the Taro deposit.[9] If plaintiff can prove that Banco spoke to him in half-truths about the Taro deposit, as these allegations suggest, then he need not prove any duty to disclose on Banco's part as a prerequisite to recovery under Rule 10b–5.

### C. The Duty Not to Disclose

Banco also argues that its fiduciary duty to customers like Taro prevents disclosure of confidential information such as the existence of the $1.9 million pledge and that it would therefore be nonsensical to hold that Rule 10b–5 would ever require such disclosures. It relies primarily on *Washington Steel Corp. v. TW Corp.,* 602 F.2d 594 (3 Cir. 1979), wherein Washington Steel sought an injunction against Chemical Bank to pre-

vent it from lending money to TW to help finance a takeover attempt by TW. The Third Circuit held that the Bank was not subject to any *per se* fiduciary duty to refrain from financing one customer's takeover of another or to any *per se* fiduciary duty to refrain from using confidential information concerning the target company in deciding whether to make the loan. It expressly avoided deciding whether disclosure of confidential information about one customer to another would violate any fiduciary duty owed to the former. 602 F.2d at 602. In other words, it avoided deciding the very issue for which it is cited by Banco—whether Banco had a fiduciary duty not to disclose the existence of the Taro deposit to Marrero. The same is true of *American Medicorp, Inc. v. Continental Illinois National Bank and Trust Company of Chicago,* 475 F.Supp. 5 (N.D.Ill., 1977), also cited by Banco.

Moreover, both cases cited by Banco involved circumstances which are factually inapposite. In each the court was concerned with the propriety of disclosing information about a target company during a hostile tender offer. While there may be some valid policy reasons to prevent a bank from disclosing information about a target company to the predator, there is no similar reason to prohibit disclosure here, where no danger to Taro seems to be involved. Indeed, such a rule could invite the sort of questionable dealings of which Banco is accused in this case.

 In addition, the failure of Banco to disclose collateral used to secure a loan for the purchase of securities, if proven, would

---

**8.** ¶ 13 of the Complaint states:

"*Misrepresentation.* During the negotiations prior to the execution of the Forebearance Agreement, Banco di Roma, through its agent, intentionally and knowingly misrepresented to Marrero that there was no collateral pledged to secure the Banco di Roma-Marrero Loan other than the ICB stock which had been pledged by Marrero. Banco di Roma failed to disclose the Taro pledge to Marrero to deceive and defraud him in connection with the Forebearance Agreement."

**9.** ¶ 16(2) of the Complaint states:

"Banco di Roma violated Section 8 [sic, Section 7] of the Securities Exchange Act, 15 U.S.C. § 78g and Regulation U promulgated thereunder, in connection with the Banco di Roma-Marrero loan by (a) failing to execute a Form U–1 prior to making the loan, (b) making the loan in an amount which exceeded the margin requirements in force at the time of the loan, (c) executing a delinquent Form U–1 containing errors and omissions, (d) failing to maintain records in compliance with the mixed collateral regulations, and (e) failing to disclose the Taro pledge."

violate Regulation U, specifically 12 C.F.R. § 211.3(a).[10] Thus, even if there were some state law duty not to disclose the Taro pledge, it would conflict with an explicit provision of federal law. Because of the Supremacy Clause of the U.S. Constitution, Art. VI, cl. 2, the federal law would control and would bar any application of the duty in this case.

### D. The Duty to Protect Plaintiff From the Misrepresentations of Others

Banco finally contends that the complaint alleges that it violated Rule 10b–5 only in that it failed to take steps to correct the misleading effect of information given to Marrero by others, specifically Abraham. That is a misreading of the complaint. Paragraphs 12 and 13 allege specific omissions and misrepresentations by Banco which make no mention of Wilson Abraham or anyone else, and paragraph 15 sets out all the elements of a violation of Rule 10b–5, including scienter.[11] The fact that information received from others may also have contributed to the purchase is a basis for a

third-party complaint, not for dismissal of this one.

## II. The Regulation U Claim

In addition to his claim for damages, Marrero asserts that he is entitled to a declaratory judgment that the note with Banco is void due, *inter alia,* to violations of Regulation U, 12 C.F.R. § 221, which provides at § 221.3(a):

"*Required statement as to stock-secured credit.* In connection with an extension of credit secured directly or indirectly by any stock, the bank shall obtain and retain in its records for at least 3 years after such credit is extinguished a statement in conformity with the requirements of Federal Reserve Form U–1 executed by the recipient of such extension of credit (sometimes referred to as the 'customer') and executed and accepted in good faith by a duly authorized officer of the bank prior to such extension . ."

10. The text of § 221.3(a) is set forth at p. 576, *infra.*

11. ¶ 13 of the Complaint is set forth in note 8, *supra.* ¶ 12 states:

"*Omissions.* During the negotiations prior to the sale of the ICB stock and execution of the Note, Banco di Roma failed to disclose the following material facts for the purpose of deceiving and defrauding Marrero:

(a) that the Banco di Roma-Abraham loan was secured by a time deposit in the amount of $1,900,000 by Taro Anstalt ("Taro"), a corporation organized under the laws of Lichtenstein [sic];

(b) that the Banco di Roma-Marrero Loan would be secured by a time deposit in the amount of $1,900,000 by Taro (the "Taro pledge");

(c) that Banco di Roma's decision to loan Marrero $1,900,000 in connection with the purchase of the ICB stock was not based upon an assessment of the value of such stock as collateral or the condition of ICB;

(d) the circumstances that resulted in the Taro pledge to secure the Banco di Roma-Abraham Loan;

(e) the circumstances that resulted in the Taro pledge to secure the Banco di Roma-Marrero Loan;

(f) the identity of the legal and beneficial owners of Taro; and

(g) the source of the $1,900,000 which was pledged by Taro."

¶ 15 alleges:

"*Securities Fraud.* Based on the foregoing, Banco di Roma has violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78aa [sic, 15 U.S.C. § 78j(b)], Rule 10b–5 promulgated thereunder, and Section 17 of the Securities Act, 15 U.S.C. § 77 [sic § 77q]. Banco di Roma utilized various means of interstate commerce and the mails to defraud Marrero in connection with the sale of ICB stock. Banco di Roma failed to disclose material facts which were necessary to prevent Marrero from being misled by the information he did receive. Moreover, this conduct by Banco di Roma was knowing and willful. Furthermore, Marrero reasonably relied upon the omissions to his detriment and damages. If Marrero had known of the Taro pledge, and the other information which Banco di Roma failed to disclose, he would not have purchased the ICB stock or executed the Note and related documents. Accordingly, Marrero is entitled to damages from Banco di Roma for injuries which were caused by its fraudulent conduct in the amount of $3,511,-019 plus any purportedly accrued interest on the Note."

He contends that Banco's disclosure of collateral was incomplete in violation of § 221.3(a) because it failed to include the Taro deposit. Plaintiff alleges that Banco also breached Regulation U by failing to execute a Form U–1 prior to making the loan, by exceeding the margin requirements, and by failing to maintain records in compliance with the mixed collateral provisions of Regulation U, 12 C.F.R. § 221.-3(n).[12] He claims that due to these violations, § 29(b) of the Securities Exchange Act, 15 U.S.C. § 78cc(b), provides him with the right to a judicial declaration that the note is void. § 29(b) provides:

> "Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, . . . shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of such contract . . . ."

In response to this claim, Banco first argues that Marrero's failure to plead § 29(b) bars him from seeking relief thereunder. However, that provision does not proscribe any particular conduct; instead it states the legal effect of a violation of Regulation U and other similar provisions. There is no requirement that plaintiff plead the legal theory upon which he intends to proceed so long as he pleads the facts which he contends form a basis for the relief sought. Moreover, even were plaintiff required to mention § 29(b) in his complaint in order to state a basis for voiding the loan contract, dismissal would not be warranted, since a simple amendment could cure the defect.

Banco also contests plaintiff's right to a declaratory judgment on the Regulation U claim on the basis of two cases which have held that there is no private right of action for damages for violation of Regulation T, 12 C.F.R. § 220, which governs the extension of credit by brokers and dealers. *Stern v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 603 F.2d 1073 (4 Cir. 1979), *Utah State University of Agriculture and Applied Science v. Bear, Stearns & Co.*, 549 F.2d 164 (10 Cir. 1977). Both cases rely heavily upon the passage of § 7(f) of the Securities Exchange Act, 15 U.S.C. § 78g(f), in 1970 and the subsequent promulgation of Regulation X, 12 C.F.R. § 224, which imposes on those who borrow funds from a bank or broker-dealer for the purpose of purchasing securities the duty to make certain that the credit obtained complies with the requirements of Regulations T and U. Reasoning that Regulation X demonstrates that private investors are not those whose protection was the primary purpose behind the promulgation of Regulation T, both the Fourth Circuit and the Tenth Circuit held that plaintiff's claim for damages under Regulation T failed to meet the requirements of *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) and was therefore subject to dismissal. Banco contends that *Stern* and *Utah State* are equally applicable to Regulation U, which is similar to Regulation T except that it regulates credit issued by banks rather than by broker-dealers.

Whatever the merits of *Stern* and *Utah State*, they both fail to reach the issue presented here, which is whether § 29(b) allows a borrower to sue for a declaration of voidness based upon a violation of Regulation U. *Stern, supra*, 603 F.2d at 1075, n.4. Moreover, the recent case of *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), strongly implies that such a right does exist. In *Transamerica* the Court held that there is no private right of action for damages under the Investment Advisers Act of 1940, 15 U.S.C. § 80b–1 *et seq.*, but at the same time it also held that § 215 of the Act, 15 U.S.C. § 80b–15, provides investors with the right to litigate the issue of the voidness of any contract entered into in violation of any provisions of

---

**12.** The alleged violations of Regulation U are set forth in ¶ 16(2) of the Complaint, which is quoted at note 9, *supra*.

the Act or of any rule or regulation promulgated thereunder.[13]

"In the case of § 215, we conclude that the statutory language itself fairly implies a right to specific and limited relief in a federal court. By declaring certain contracts void, § 215 by its terms necessarily contemplates that the issue of voidness under its criteria may be litigated somewhere. At the very least Congress must have assumed that § 215 could be raised defensively in private litigation to preclude the enforcement of an investment advisers contract. But the legal consequences of voidness are typically not so limited. A person with the power to void a contract ordinarily may resort to a court to have the contract rescinded and to obtain restitution of consideration paid. See *Deckert v. Independence Corp.*, 311 U.S. 282, 289, 61 S.Ct. 229, 233, 85 L.Ed. 189; Williston, Contracts, 3d edition, § 1525; Pomeroy, Equity Jurisprudence, 4th edition, §§ 881 and 1092. And this Court has previously recognized that a comparable provision, § 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(b), confers a 'right to rescind' a contract void under the criteria of the statute. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 388, 90 S.Ct. 616, 623, 24 L.Ed.2d 593. Moreover, the federal courts in general have viewed such language as implying an equitable cause of action for rescission or similar relief. E.g., *Kardon v. National Gypsum Co.*, 69 F.Supp. 512, 514 (D.C.E.D.Pa.1946); see III Loss, Securities Regulation 1758–1759 (2d ed. 1961). Cf. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 735, 95 S.Ct. 1917, 1925, 44 L.Ed.2d 539.

"For these reasons we conclude that when Congress declared in § 215 that certain contracts are void, it intended that the customary legal incidents of voidness would follow, including the availability of a suit for rescission or for an injunction against continued operation of the contract, and for restitution."

100 S.Ct. at 246–47.

 § 215 of the Investment Advisers Act is virtually identical in its language to § 29(b) of the Securities Exchange Act, and the above-quoted passage therefore applies with equal force to the Regulation U claim made by Marrero. Banco contends that *Transamerica* is distinguishable because the sections of the Investment Advisers Act at issue there were enacted in order to protect investors, while Regulation U was not promulgated in order to protect borrowers, as *Stern* and *Utah State* demonstrate. However, the Court did not rely on that fact in holding that there was a private right of action under § 215 to bring suit to void an investment contract. Rather, it relied upon the language of § 215. Whether or not a private right of action for damages exists under Regulation U, § 29(b) of the Securities Exchange Act gives rise to a right to sue for a declaration of voidness for a violation of Regulation U.[14]

 Finally, Banco questions the effect that a declaration of voidness would have upon Marrero's obligation to repay the loan. *Transamerica, supra,* indicates that if the loan were held to be void, Marrero would be entitled to the return of the note and related documents from Banco in exchange for return of the money which he borrowed. 100 S.Ct. at 249, n.14. That outcome may be of little value to Marrero, but it does not warrant dismissal of the claim.

**13.** Section 215 of the Investment Advisers Act provides in relevant part:

"§ 80b–15. Validity of contracts

. . . . .

(b) Every contract made in violation of any provision of this subchapter and every contract theretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this subchapter, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation or order, shall have made or engaged in the performance of any such contract . . . . "

**14.** Liability under § 29(b) is subject to the usual equitable defenses and may be invoked only by "an unwilling innocent party." *Stern, supra,* 603 F.2d at 1074, n.4 and cases cited therein.

### III. The Blue Sky Claim

In the complaint Marrero also claims that the loan transaction is void because Banco violated the Louisiana Blue Sky Law, La.R.S. 51:715A(3).[15] The plain language of that act mandates that only a seller; a partner, officer, or director of a seller; or a dealer or agent who materially aids in a sale of securities may be liable thereunder. Banco falls in none of these categories and plaintiff has never contended otherwise. Therefore, this limited aspect of the motion to dismiss must be granted. Accordingly,

IT IS ORDERED that the Motion to Dismiss is GRANTED as to the claim brought under the Louisiana Blue Sky Law and otherwise DENIED.[16]

---

**15.** La.R.S. 51:715A provides in relevant part:
"§ 715. Civil Liabilities
A. Any person who:

 (3) Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known of the untruth or omission, is liable to the person buying the security from him . . .
B. Every person who directly or indirectly controls a seller liable under Subsection (A), every partner, officer, or director or [sic] such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the non-seller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist . . . ."

**16.** In its post-argument memorandum, Banco requests that if its motion is denied, the issues raised therein be certified to the Fifth Circuit Court of Appeals for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). There is no doubt that this order involves a controlling question of law as to which there is substantial ground for difference of opinion. However, I do not believe that an immediate appeal will materially advance the ultimate termination of this litigation. Banco is a third-party defendant in the consolidated case of *Marrero v. Abraham*, C.A. 76–2891 "G", and every factual issue involved in this case is also involved in the Marrero-Abraham suit. Moreover, trial is less than six months away, and it is highly doubtful that the Fifth Circuit would be able to decide the complex issues raised by this motion before trial on the merits. In view of these factors and the general policy against piecemeal appeals, I therefore decline to certify the issues raised by Banco's motion for interlocutory appeal.