Clarence J. BASSLER,
Plaintiff-Appellant,

v.

CENTRAL NATIONAL BANK IN
CHICAGO, Defendant-Appellee.

No. 81–2101.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 22, 1982.

Decided Aug. 16, 1983.

Patrick J. Phillips, Jenner & Block, Chicago, Ill., for plaintiff-appellant.

Alan N. Salpeter, Mayer, Brown & Platt, Chicago, Ill., for defendant-appellee.

Before SPRECHER * and CUDAHY, Circuit Judges, and DOYLE, Senior District Judge.**

JAMES E. DOYLE, Senior District Judge.

This is an appeal from an order dismissing the complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). The allegations of the complaint, liberally construed, are summarized in the following paragraph.

Commencing in 1974 plaintiff (Bassler) entered into a series of loan transactions

---

* Judge Sprecher heard oral argument and participated in the conference which followed. He died May 15, 1982, and did not participate in the preparation or approval of this opinion.

** James E. Doyle, a Senior United States District Judge for the Western District of Wisconsin, is sitting by designation.

with defendant (Central) to finance Bassler's purchase of Rochelle Bank and Trust Company (Rochelle) stock. Bassler executed and delivered promissory notes and thereafter executed other notes to Central in connection with the purchase, and pledged Rochelle stock as security for the notes. From 1974 to 1980, Central has continued to receive payments on the loans Bassler originally obtained in 1974. Central failed to obtain from Bassler the statement which Regulation U (12 C.F.R. § 221) requires when an extension of credit is secured by stock. Central defrauded Bassler in that Central knew that the Rochelle stock had no value, but did not disclose this to Bassler.

The theory of the first count of the complaint is that by failing to obtain a Regulation U statement signed by Bassler, Central violated section 7(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78g(d),[1] and Regulation U, promulgated by the Federal Reserve Board, 12 C.F.R. § 221, pursuant to section 7 of the Act. The theory of the second count is that by failing to disclose to Bassler the worthlessness of the Rochelle stock, Central violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and also Rule 10b–5 of the General Rules and Regulations promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5. Bassler

seeks a judgment voiding the group of loans to him from Central.

In granting Central's Rule 12(b)(6) motion to dismiss, the district court held, as to the first cause of action, that no private action is available and, as to the second cause of action, that Bassler had failed to allege facts from which there could be inferred a duty on the part of Central to disclose.

## I. FIRST CAUSE OF ACTION

Section 7(d) requires persons who extend or maintain credit in security transactions to comply with Federal Reserve Board rules and regulations.[2] Subsection (f) of § 7, adopted in 1970, makes it unlawful for a borrower to obtain credit in a security transaction which is prohibited by § 7 or by rules or regulations.[3]

Before *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), several courts had recognized a private right of action under § 7 and its regulations, although none is explicitly granted by the Act. *E.g., Goldman v. Bank of the Commonwealth,* 467 F.2d 439, 445–46 (6th Cir. 1972) (Regulation U); *Pearlstein v. Scudder & German,* 429 F.2d 1136, 1139 (2d Cir.1970) (Regulation T), *cert. denied,* 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1976). In *Cort v. Ash,* the Court set forth criteria for determining whether a statute implies a

---

**1.** Apparently by inadvertence, the complaint cites section 7(d) of the Act as 15 U.S.C. § 78j(b).

**2.** Section 7(d) of the Act provides in pertinent part:

It shall be unlawful for any person not subject to subsection (c) to extend or maintain credit or to arrange for the extension or maintenance of credit for the purpose of purchasing or carrying any security, in contravention of such rules and regulations as the Federal Reserve Board [Board of Governors of the Federal Reserve System] shall prescribe to prevent the excessive use of credit for the purchasing or carrying of or trading in securities in circumvention of the other provisions of this section.

Regulation U provides in pertinent part:

(a) *Required statement as to stock-secured credit.* In connection with an extension of credit secured directly or indirectly by any

margin stock, the bank shall obtain and retain in its records for at least 3 years after such credit is extinguished a statement in conformity with the requirements of Federal Reserve Form U–1 executed by the recipient of such extension of credit (sometimes referred to as the "customer") and executed and accepted in good faith by a duly authorized officer of the bank prior to such extension .... 12 C.F.R. § 221.3

**3.** Subsection 7(f) reads in pertinent part: "It is unlawful for any United States person ... to obtain, receive, or enjoy the beneficial use of a loan or other extension of credit from any lender ... for the purpose of (A) purchasing or carrying United States securities, or (B) purchasing or carrying within the United States of any other securities, if, under this section or rules and regulations prescribed thereunder, the loan or other credit transaction is prohibited ...."

private right of action. The relevant issues are: (1) whether the plaintiff is a member of the class for whose "especial benefit" the statute was passed; (2) whether there is any indication of legislative intent, explicit or implicit, either to create a private right of action or to deny one; (3) whether a private right is consistent with the underlying purposes of the legislative scheme; and (4) whether the claim is one traditionally assigned to state law so that it would be inappropriate to infer a claim based on federal law.

Since *Cort,* every circuit court of appeals considering the matter has denied individual investors a private remedy under § 7 and its regulations. *Walck v. American Stock Exchange, Inc.,* 687 F.2d 778 (3d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2118, 77 L.Ed.2d 1300 (1983); *Gilman v. Federal Deposit Insurance Corp.,* 660 F.2d 688 (6th Cir.1981) (Regulation U); *Gutter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 644 F.2d 1194 (6th Cir.1981), *cert. denied,* 455 U.S. 909, 102 S.Ct. 1256, 71 L.Ed.2d 447 (1982), *reh'g denied,* 455 U.S. 1008, 102 S.Ct. 1647, 71 L.Ed.2d 877 (1982) (Regulation T); *Stern v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 603 F.2d 1073 (4th Cir.1979) (Regulation T); *Utah State University of Agriculture and Applied Science v. Bear, Stearns & Co.,* 549 F.2d 164 (10th Cir.1977), *cert. denied,* 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 176 (1977) (Regulation T). In *Capos v. Mid-America National Bank of Chicago,* 581 F.2d 676 (7th Cir.1978), we noted that the *Cort v. Ash* guidelines raised questions concerning whether Regulation U implies a private right of action. 581 F.2d at 678–79. However, we did not decide the question.

We appreciate that even as the courts of appeals have been striving in these § 7 cases to apply the mode of analysis dictated by *Cort* and consistently concluding that no private cause of action is implied, the Supreme Court has been signaling that of the four factors enunciated in *Cort,* the second—whether there is any indication of Congressional intent, explicit or implicit, to create or to deny a private remedy—is the key and that the *Cort* mode is but one of several permissible approaches to ascertainment of that intent. Among the decisions in which these signals have appeared, chronologically, are *Touche Ross & Co. v. Redington,* 442 U.S. 560, 576–77, 99 S.Ct. 2479, 2489–90, 61 L.Ed.2d 82 (1979); *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis,* 444 U.S. 11, 15–16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979); *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 374–378, 102 S.Ct. 1825, 1837, 72 L.Ed.2d 182 (1982); and *MacLean v. Huddleston,* —— U.S. ——, 103 S.Ct. 683, 686–690, 74 L.Ed.2d 548 (1983). In *Barany v. Buller,* 670 F.2d 726, 730 (7th Cir.1982), we noted that "whether Congress intended to create the particular right of action being asserted ... is strictly a matter of statutory interpretation." And in *Allison v. Liberty Savings,* 695 F.2d 1086, 1088 (7th Cir. 1982), we observed: "All four [*Cort*] factors are not equally weighted; the central inquiry is whether Congress intended to create a private right of action."

Thus, as this circuit court of appeals addresses, in its turn in the post-*Cort* era, the question whether there exists an implied private right of action under § 7 and its implementing regulations, we consider ourselves obliged to search widely for indications of Congressional intent. More specifically, we believe that even if we were to share the conclusion reached by other circuit courts of appeals since *Cort,* that § 7 was not enacted for the "especial benefit" of individual investors, we would be bound to inquire whether there is other evidence of a Congressional intent impliedly to create a private remedy for them.

Nevertheless, even in an uninhibited search for Congressional intent, it is important to inquire whether it was a major purpose of Congress, in enacting § 7, to protect individual investors. The presence of this major purpose would make more reasonable, although it would not compel, the inference that Congress intended individual investors to enjoy a private remedy.

Subsection 7(d) authorizes the Federal Reserve Board to prescribe regulations "to

prevent the excessive *use* of credit for the purchasing or carrying of or trading in securities." 15 U.S.C. § 78g(d) (1981) (emphasis added). It is the borrowing individual investors who use credit. It is their conduct at which the statute is aimed. While subsection 7(d) makes it unlawful for lenders to fail to require the investors to furnish Regulation U statements, subsection 7(f), added in 1970, makes it unlawful for individual investors to obtain credit in transactions in which they fail to provide Regulation U statements. The imposition of this latter prohibition upon the borrowing investors is not compatible with the view that § 7(d) was enacted, and Regulation U was promulgated, for their especial benefit.

Bassler seeks to undercut this implication of § 7(f) by referring to that provision of § 7(d) which authorizes the Board to promulgate exemptions from § 7(d) and from regulations issued under § 7(d), and by referring to § 6(a) of Regulation X (12 C.F.R. § 224.6(a)) in which the Board undertook to promulgate such an exemption by providing: "An innocent mistake made in good faith by a borrower in connection with the obtaining of a credit shall not be deemed to be a violation of this part (Regulation X) if promptly after discovery of the mistake the borrower takes whatever action is practicable to remedy the non-compliance." (Regulation U is incorporated by reference into Regulation X). Bassler contends that there is nothing in the record to show that his failure to provide the Regulation U statement was other than an innocent mistake. The argument is unpersuasive. Whether Bassler was or was not innocently mistaken may be of some legal significance in some specific controversy. But the question presently is whether, in broad terms, it was a major purpose of Congress, in enacting § 7(d), to protect borrowing investors. To impose the prohibitions of § 7(d) (and regulations promulgated under it) both upon the lenders and upon the borrowing investors, as Congress did in § 7(f), is strongly to imply that § 7(d) was not enacted with the major purpose of protecting borrowing investors, even though the Board may have taken pains to spare innocently mistaken borrowing investors from sanctions for their violations.[4]

Bassler contends that §§ 29(b) and 27 of the Act (15 U.S.C. §§ 78cc(b), 78aa) lend support to the contention that § 7(d) implies a private right of action for borrowing investors against lending banks.[5] Section 29(b) provides:

> Every contract made in violation of any provisions of this title [which includes § 7(d)] or of any rule or regulation thereunder, and every contract . . . heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this title or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract . . . .

Reliance is placed particularly upon *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), in which § 215(b) of the Investors Advisors Act of 1940, 15 U.S.C. § 80b–15 (the language of which closely parallels

---

4. To the extent, if any, that the facts of this case are relevant, it is noted that the complaint does not allege that the failure to provide the Regulation U statement was an innocent mistake on Bassler's part or that, promptly after he discovered the mistake, he provided the bank with the statement.

5. Bassler failed in the district court to cite § 29(b) as a basis for a private right of action. The bank contends, with considerable justification, that this court should not entertain the contention. Bassler's rejoinder is that he relies here, as he did below, on § 7(d) as the source of the implied right of action, but contends that § 7(d) is to be construed in the context of the entire Act, including § 29(b). Although Bassler then appears, in briefing and oral argument, to lapse into a contention that § 29(b), standing alone, rather explicitly authorizes the private right of action, we will address the point. The bank has taken the opportunity, both in brief and oral argument, to respond to the § 29(b) contention, however that contention may be characterized.

that of § 29(b) of the Securities Act) was held to create a private right of action in clients of investment advisors. We cannot agree that *TAMA* requires that § 7(d) of the Securities Act, and Regulation U, should be construed to imply a private right of action against a lending bank by a borrowing investor from whom the bank has failed to obtain a Regulation U statement.

In *TAMA,* the Court noted, initially, that both the language of the Advisors Act and its Congressional history showed clearly that Congress intended to benefit the clients of investment advisers and the parties to advisory contracts. However, the Court observed that, standing alone, clear Congressional intent to benefit the clients is insufficient to demonstrate that Congress intended also to create in the clients a private right of action against the advisers for conduct violative of the Advisors Act. The Court found it necessary to examine the Congressional history of the Act and its language to determine whether Congress intended specifically to create the private right of action. Finding that the Congressional history was silent on the availability of any private remedy, the Court looked to § 206 (which is roughly comparable to § 7(d) of the Securities Act) and to § 215 (closely comparable to § 7(d) of the Securities Act) and decided that the language of those two sections is adequate to support limited private actions; that is, actions to void specific contracts which are declared void by § 215. 444 U.S. at 17–19. Continuing, the Court looked both to the language of the Act and to its history and decided that Congress did not intend to create private actions other and broader than actions to void contracts.

*TAMA's* teaching is somewhat elusive as it bears on the question we must decide. In *Marrero v. Banco di Roma (Chicago),* 487 F.Supp. 568, 577 (E.D.La.1980), the court read *TAMA* to hold that the language of § 215 of the Advisors Act created a limited private right of action in clients as against advisers, without regard to whether a purpose of the Advisors Act was to benefit the clients. If this reading is correct, it follows that the closely comparable language of § 29(b) of the Securities Act creates in investment borrowers like Bassler at least a limited private right of action as against lenders who violate § 7(d) or Regulation U. The Court's opinion in *TAMA* does not make explicit that the language of § 215, alone, would have been insufficient to raise the implication of a private remedy in the clients as against the investment advisers, had Congress not otherwise revealed a clear intention to benefit the clients.

However, the failure of the *TAMA* Court to make this point explicit does not persuade us that the Court meant to hold that the language of § 215, alone, created a private remedy in the clients of investment advisors, or that language closely resembling that of § 215 automatically creates such a private remedy whenever it appears in a statute. Rather, we are persuaded that only when there are other and independent clues to Congressional intent to create a private remedy can language like that of § 215 be so construed. In *TAMA* the Court found such other independent clues in the central provisions of the Advisors Act and in the nature of the problem to which that Act was obviously addressed. No similar clues are present with respect to § 7 of the Securities Act.

Although rather ambivalently acknowledging that § 27 of the Securities Act of 1934 (15 U.S.C. § 78aa) "may not of itself create any private cause of action," Bassler contends that § 27 lends support to the contention that a private remedy is implied in § 7(d). Also, Bassler stresses that § 27 confers upon the federal district courts jurisdiction "of all suits in equity and *actions at law* brought to enforce any liability or duty created by this title [15 U.S.C. §§ 78a et seq.] or the rules and regulations thereunder" (emphasis added). In *Touche Ross & Co., supra,* the Court made explicit that § 27 "creates no cause of action of its own force and effect ...." 442 U.S. at 577, 99 S.Ct. at 2490. The Court rejected the suggestion that in *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), it had expressed itself otherwise. *Id.*

We conclude that neither § 7(d), § 29(b), § 27 nor any other provision of the Securities Exchange Act of 1934, read separately or in the context of the entire Act, implies that the Act was intended by Congress to confer a right of action upon investment borrowers as against investment lenders.

In *Merrill Lynch, Pierce, Fenner & Smith v. Curran, supra,* at 378–379, the Court observed:

In determining whether a private cause of action is implicit in a federal statutory scheme when the statute by its terms is silent on that issue, the initial focus must be on the state of the law at the time the legislation was enacted. More precisely, we must examine Congress' perception of the law it was shaping or reshaping. When Congress enacts new legislation, the question is whether Congress intended to create a private remedy as a supplement to the express enforcement provisions of the statute. When Congress acts in a statutory context in which an implied private remedy has already been recognized by the courts, however, the inquiry logically is different. Congress need not have intended to create a new remedy, since one already existed; the question is whether Congress intended to preserve the pre-existing remedy.

The Court proceeded to determine in *Merrill Lynch* that prior to the enactment of the comprehensive 1974 amendments to the Commodities Exchange Act, at issue there, there had long been recognized an implied private right of action under the Act on the part of the plaintiffs seeking damages for violation of the Act or its implementing regulations. The Court concluded that in 1974, Congress intended to preserve those implied private rights of action.

In the present case, by contrast, in 1934 "Congress' preception of the law that it was shaping" must have been a perception that it was plowing new ground, bringing the power of the national government to bear on what was perceived as a major economic evil in our society—uncontrolled speculation in corporate stocks. The Congressional history indicates that the Act was not passed for the protection of individual investors. Although there are many legislative documents concerning the Act, one report frequently has been cited as the most authoritative. *See* Note, *Federal Margin Requirements as a Basis for Civil Liability,* 66 Colum.L.Rev. 1462, 1468 (1966). In discussing the purpose of the Act, this report states: "The main purpose is to give a Government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation into the stock market and out of other more desirable uses of commerce and industry . . . ." House Comm. on Interstate and Foreign Commerce, Report on H.R. 9323, H.R.Rep. No. 1383, 73d Cong., 2d Sess. 8 (1934). The report further notes that the legislation's main purpose is not protection of the small speculator, "although such a result will be achieved as a byproduct of the main purpose." *Id.* This document indicates that the purpose was to promote the nation's financial health, not especially to protect individuals investing in the securities market. Excerpts from congressional debate suggest that Congress was concerned to some extent with individual investors, but the primary purpose for creating the credit regulation system was to safeguard the national economy. "[A]n unbroken line of judicial findings of legislative purpose behind Section 7 . . . stretching back over a period of forty years, and . . . the careful delineation of legislative history as made by legal scholars over the years," have shown that protection of the individual investor was not a major goal of the statute. *Stern v. Merrill Lynch, Pierce, Fenner & Smith,* 603 F.2d 1073, 1091 (4th Cir.1979).

We conclude that there is no indication of legislative intent, explicit or implicit, to create a private right of action in individuals in Bassler's position as against lenders in Central's position.

The district court correctly dismissed plaintiff-appellant's first cause of action.

## II. SECOND CAUSE OF ACTION

As Central observes in argument to this court, the terse allegations of the complaint conjure up a curious scenario: that, knowing the worthlessness of the Rochelle stock which Bassler innocently proposed to pledge as security, Central proceeded nevertheless to make the loan and to permit it to continue over a period of years. Except for the allegation that Central knew the Rochelle stock was worthless, the complaint does not allege that Central had had anything to do with the particular shares or other shares of Rochelle stock prior to its loan transaction with Bassler. Nor does it allege that any dealings of any kind had occurred earlier between Central and Bassler.

In the course of briefing and argument both in the district court and in this court, counsel for plaintiff has asserted that the Rochelle stock had been pledged to Central earlier by some borrower other than Bassler, that Central had become aware of its worthlessness, and that Central had somehow induced an innocent Bassler to acquire the worthless stock and pledge it for a loan by Central to Bassler. Representations of this kind by counsel, of course, cannot be treated as if they were allegations of the complaint or as if they were amendments to the complaint.

However, the question before us is whether the actual allegations of the complaint, liberally construed, are broad enough to permit, at trial, the presentation of evidence of the circumstances to which plaintiff's counsel refer in brief and argument. We conclude that the allegations are sufficiently broad.

Construed with considerable liberality, the complaint alleges that Central induced Bassler to enter into a loan transaction with knowledge on the part of Central, but not on the part of Bassler, that if Bassler defaulted, the sale of the pledged Rochelle stock would produce little or no money to apply to the loan, thus exposing to judgment whatever other assets Bassler might possess.

However, Central contends that even if the complaint is thus liberally construed, it fails to allege, explicitly or by implication, any fact from which it can be inferred that Central owed Bassler a duty to disclose the information that the Rochelle stock was worthless. Counsel have briefed and argued at length the state of the law concerning duty to disclose, with special reference to *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). We think it unnecessary to engage heavily in that exercise.

The oft-quoted test as enunciated in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), is whether "it appears beyond doubt [from the allegations of the complaint] that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." We consider that this complaint is sufficiently broad to permit plaintiff to prove—if, of course, such evidence exists—that at the time this loan transaction was entered into, there existed between Central and Bassler, perhaps because of prior dealings or because of the particular circumstances of this transaction itself, a "relationship of trust and confidence," *Chiarella,* 445 U.S. at 230, 100 S.Ct. at 1115, from which a duty of disclosure by Central had arisen. Accordingly, we hold that it was error to dismiss the second cause of action.

The judgment of the district court is affirmed as to the first cause of action alleged in the complaint and it is reversed as to the second cause of action. The case is remanded for further proceedings under the second cause of action.