WEST POINT–PEPPERELL, INC.,
Plaintiff and
Counterclaim–Defendant,

v.

FARLEY INC., Defendant and
Counterclaim–Plaintiff,

and

Trust Company Bank, Defendant.

FARLEY INC. and Farley/WPM Acquisition Corp., Counterclaim–Plaintiffs,

v.

WEST POINT–PEPPERELL, INC.,
Plaintiff and
Counterclaim–Defendant,

and

Joseph L. Lanier, Donald J. Keller, W. Cecil Bauer, Henry H. Henley, Jr., Clarence J. Kjorlier, Gerald B. Mitchell, Harry M. Philpott, Yetta G. Samford, Jr., C. McKenzie Taylor and Charles J. Woodruff, Additional Counterclaim–Defendants.

WEST POINT–PEPPERELL, INC. and J.P. Stevens & Co., Inc., Plaintiffs,

v.

FARLEY INC., Farley/WPM Acquisition Corp., Farley/WPM Holding Corp., Farley/WPM Subsidiary Corp. and Drexel Burnham Lambert Inc., Defendants.

Nos. 3:88–cv57–GET, 3:88–cv113–GET.

United States District Court,
N.D. Georgia,
Newnan Division.

Nov. 14, 1988.

King & Spalding, Atlanta, Ga., Willis, McKenzie & Long, LaGrange, Ga., for West Point–Pepperell, Inc.

Bondurant, Mixson & Elmore, Atlanta, Ga., for Farley Inc.

Rogers & Hardin, Atlanta, Ga., for Trust Co. Bank.

## MEMORANDUM DECISION AND ORDER

G. ERNEST TIDWELL, District Judge.

West Point–Pepperell, Inc. ("West Point") is a Georgia corporation with its principal executive offices located in West Point, Georgia. As of July 29, 1988, West Point, a diversified manufacturer and marketer of consumer soft goods, had approximately 29.4 million shares of stock outstanding. West Point presently employs some 40,000 people.

J.P. Stevens & Co., Inc. ("Stevens") is a Delaware corporation and wholly-owned subsidiary of West Point. West Point acquired Stevens on May 7, 1988 following a contested bidding contest for the company. In accordance with a Federal Trade Commission ("FTC") "Hold Separate Agreement," West Point currently holds the Stevens' businesses as separate operating units; the Hold Separate Agreement is expected to expire in December 1988.

Farley Inc. ("Farley") is a Delaware corporation with its principal executive offices located in Chicago, Illinois. Farley, through its subsidiaries and operating units, is engaged in the manufacture of men's, women's and children's apparel and footwear as well as precision metal products. Prior to the commencement of its tender offer, Farley owned directly or ben-

eficially 2,872,800 shares of West Point stock, representing approximately 9.8% of the company's outstanding shares, and making Farley West Point's largest shareholder.

Farley/WPM Acquisition Corp. ("Acquisition"); Farley/WPM Holding Corp. ("Holding") and Farley/WPM Subsidiary Corp. ("Subsidiary") are each Delaware corporations and each is either a directly or indirectly wholly-owned subsidiary of Farley. Farley created these designated entities for the purpose of its contemplated tender offer for West Point.

Drexel Burnham Lambert Inc. ("Drexel") is a Delaware corporation with its principal executive offices located in New York, New York. Drexel provides a full range of financial and investment banking services to its clients. Drexel is providing financial services to Farley and is acting as the Dealer Manager for the tender offer for West Point. Drexel or persons designated by Drexel presently own approximately 13% of Farley's common stock.

The facts surrounding this matter are both extensive and complex. The court will briefly outline only those facts which are necessary to the present resolution of this matter. On October 30, 1987, the Board of Directors (the "Board") of West Point adopted, without prior notice or the approval of shareholders, a Rights Agreement, pursuant to which the Board declared a dividend of one Right (the right to purchase 1/1000th of a share of Series A Junior Participating Preferred Stock for $90) for each outstanding share to all shareholders of record as of November 24, 1987. Under the original terms of the Rights Agreement, the rights were not exercisable, and no certificates evidencing the rights would be issued, until the plan was triggered by someone (i) acquiring 20% or more of West Point's shares (an "Acquiring Person") and then engaging in certain "self-dealing" transactions with the Company, or (ii) the commencement or announcement of an intention to commence a tender or exchange offer for West Point shares that would result in beneficial ownership of 30% or more of the outstanding

West Point shares. The Rights Agreement explicitly excepts West Point itself from such restrictions.

Upon the triggering of the plan, the rights would become exercisable and allow all shareholders, except the Acquiring Person, to purchase in lieu of the preferred stock the number of West Point common shares representing a market value of $180 for $90.

Effective March 3, 1988, the Georgia Legislature amended the Georgia Business Corporation Code (the "Code") by enacting Article 11A, O.C.G.A. §§ 14–2–236 *et seq.* (1988) (the "Anti–Takeover statute"). The new Anti–Takeover statute, similar to laws adopted in Delaware and New York among other states, imposes severe limitations on "business combinations" between a company and its "interested shareholders" for a period of five years after the date of the transaction in which a shareholder becomes interested; absent certain exceptions. The Anti–Takeover statute provides that it shall apply to any Georgia resident domestic corporation which "opts-into" coverage by the statute through the adoption of a by-law specifically stating such intention. The Board of West Point, without a shareholder vote, opted-into coverage by the statute.

On May 23, 1988, Farley announced its intention and sought the approval of the FTC and the Antitrust Division to acquire up to 25% of West Point's outstanding shares by filing a Notification and Report Form under the Hart–Scott–Rodino Act.

On June 1, 1988, eight days after Farley filed its Hart–Scott–Rodino Notice, the West Point Board amended the Rights Plan to reduce its triggering point from 20% to 10% and to remove the requirement that the Acquiring Person engage in any "self-dealing" transaction prior to the rights becoming exercisable. In addition, the plan was amended to include an "exchange option" whereby the Board, at its option, may exchange the rights of non-Acquiring shareholders for additional shares of West Point common stock without the payment of any consideration at the rate of one share per right.

On June 2, 1988, West Point filed a civil action in the Superior Court of Troup County, Georgia, seeking a declaration that West Point's Rights Agreement (interchangeable referred to as Rights Plan), as amended, is valid and enforceable under Georgia law. Farley immediately sought to remove the action to this court. The court granted the petition and denied a subsequent motion to remand the proceedings back to state court. *See* Order dated July 14, 1988 (Civil Action No. 3:88–cv–57–GET).

On October 24, 1988, Farley, by and through its subsidiaries, announced an all cash $48 per share tender offer for all outstanding shares and associated rights of West Point stock by filing a Schedule 14D–1 with the Securities and Exchange Commission (the "SEC") and delivering a copy of such to West Point, as required by Section 14(d)(1) of the Exchange Act, 15 U.S.C. § 78n(d)(1), and Rule 14D–1, 17 C.F.R. § 240.14d–1. In addition, Farley mailed a copy of its offer to purchase to all West Point shareholders. The tender offer is scheduled to expire at midnight, New York City time, on November 21, 1988 and is conditioned upon the following:

(1) A minimum of 16,726,604 Shares being validly tendered and not withdrawn before the expiration of the Offer (or such greater number of Shares as, together with Shares beneficiary owned by the Purchaser and its affiliates, represents a minimum of 66⅔% of the Shares outstanding on a fully diluted basis at the time Shares are first accepted for payment under the Offer), (2) the Company's preferred share purchase rights having been redeemed by the Board of Directors of the Company or the Purchaser otherwise being satisfied in its sole discretion that such Rights are not applicable under the circumstances, (3) the Purchaser *being satisfied in its sole discretion* that the provisions of Article 11 and Article 11A of the Georgia Business Corporation Code are inapplicable to the Offer and the Merger (as described herein) or are invalid (either by action of the Board of Directors of the Company, by final judicial determination or otherwise),

or, in the case of Article 11, that the Merger may be consummated without the vote required thereby at a price per Share not in excess of the price to be paid in the offer, and (4) the Purchaser's having obtained financing, on terms acceptable to it, in an amount sufficient to enable the Purchaser to purchase such number of Shares as is being sought in the Offer and to pay all related fees and expenses.

Following the announcement of the tender offer, Farley filed a counterclaim in 3:88–cv–57–GET, challenging the constitutionality of Article 11 of the Georgia Code (the "Fair–Price statute") under the Georgia Constitution as well as the constitutionality of the Anti–Takeover statute under the Supremacy and Commerce Clauses of the United States Constitution. In addition, Farley challenges the legality and validity of West Point's Rights Plan. Farley seeks preliminary injunctive relief preventing the application of the Anti–Takeover statute and West Point's Rights Plan to its current tender offer.

In response to Farley's action, West Point filed a separate suit, 3:88–cv–113–GET, alleging that Drexel, Farley's advisor, is violating a "standstill" agreement which prevents Drexel from seeking to acquire J.P. Stevens & Co., Inc. and from "assist[ing], advis[ing], encourag[ing], or provid[ing] any other person seeking to acquire" Stevens. *See* Letter Agreement between Stevens' Special Committee and Odyssey. West Point also alleges that the financing for Farley's tender offer violates the margin requirements for borrowing in relation to the purchase of margin stock contained in Section 7 of the Exchange Act of 1934, 15 U.S.C. § 78g, as well as various related disclosure requirements. West Point seeks preliminary injunctive relief restraining Drexel from violating the standstill agreement and restraining Farley from violating the federal margin and disclosure requirements.

On November 10, this court held a hearing on the two motions for preliminary relief. The hearing was attended by counsel for all parties. In addition to the par-

ties to the present actions, counsel for a group of shareholders presently seeking class certification in a related action participated in the hearing as did a representative of the Office of the Attorney General for the State of Georgia. The law in the context of the present matter is both complex and in a state of relative flux, reflecting the greater debate currently underway in the business, academic, and legislative circles of the nation concerning what has been aptly termed by some the "battle for corporate control."

This opinion will address and decide the various motions in the context of the requested preliminary relief. It is well-settled within this circuit that in order to obtain a preliminary injunction, the moving party must establish: (1) a substantial likelihood that the movant will prevail on the merits at trial; (2) a substantial threat that the movant will suffer irreparable harm if they are not granted the injunctive relief; (3) the benefits the injunctive relief will provide the movant outweighs the harm which such relief may cause the opposing party; and (4) the injunctive relief will not be adverse to the interests of the public. *See Fields v. Rockdale County, Georgia,* 785 F.2d 1558 (11th Cir.1986), *cert. denied,* 479 U.S. 984, 107 S.Ct. 571, 93 L.Ed.2d 575 (1986); *Callaway v. Block,* 763 F.2d 1283, 1287 (11th Cir.1985); *Original Appalachian Artworks v. Topps Chewing Gum, Inc.,* 642 F.Supp. 1031 (N.D.Ga.1986).

## THE STANDSTILL AGREEMENT CLAIM

■ West Point and Stevens contend that Drexel is in violation of a March 3, 1988 standstill and confidentiality agreement (the "Special Committee/Odyssey Standstill") executed by and among Odyssey Partners ("Odyssey") (a bidder for J.P. Stevens) and the Chairman of a Special Committee of the Board of Directors of Stevens (the "Special Committee"), established to evaluate the bids for Stevens. West Point does not contend that Drexel was a signatory to the agreement, rather they argue that Drexel is bound by the agreement since they served as an advisor to Odyssey, and received "evaluation mate-

rials" relating to Stevens and its then present and projected business activities. In this regard, West Point relies upon a provision of the agreement which states:

1. You hereby agree that the Evaluation Material will be used solely for the purpose of evaluating a possible transaction between the Company and you, and that such information, including the fact that such information has been made available to you, will be kept confidential by you and your advisors; *provided, however,* that (a) any of such information may be disclosed to your directors, officers, employees, advisors (including prospective lenders and investors) and representatives of your advisors who need to know such information for the purpose of evaluating any such possible transaction between the Company and you (it being understood that such directors, officers, employees, advisors and representatives shall be informed by you of the confidential nature of such information and shall be directed by you to treat such information and shall be directed by you to treat such information confidentially and shall have agreed for the benefit of the Company, as a condition to their receipt of such information, to abide by the provisions hereof)....

There exists conflicting testimony as to whether Drexel was or was not informed about the confidentiality arrangement.

It is apparent that the standstill agreement is controlled by New York law in light of the fact that the agreement was both negotiated and delivered in New York and both signatory parties are located in the state.

It is a fundamental rule of contract construction that the intentions of the parties control and that one factor in determining such intentions is to look to the purpose of the contract and the circumstances surrounding its making. 4 Williston, Contracts [3d. ed.] §§ 601, 619.

The facts presented clearly indicate that the standstill agreement was entered into in an attempt by the Special Committee to control the auction for Stevens. The sub-

ject matter of the agreement, the "evaluation materials," were provided to Odyssey in order for Odyssey to formulate its bid for Stevens. On March 14, 1988, Stevens and two subsidiaries of Odyssey entered into a merger agreement which, by its terms superseded all prior agreement between the parties. *See* Section 10.11 of the March 14 Merger Agreement. Following further bidding, West Point and two Odyssey subsidiaries negotiated an agreement whereby each entity would receive some parts of Stevens' business. This accord was evidenced by a Settlement Agreement between the Odyssey bidders and West Point which included an expanded standstill provision prohibiting the Odyssey subsidiaries from attempting to seek control of West Point for a period of seven years. The evidence indicates that West Point sought to bind Drexel by such agreement, but Drexel explicitly refused to be bound by such an agrement. After the consummation of the negotiated Settlement Agreement, the auction for Stevens was complete and Stevens ceased to exist as a publicly traded corporation. In addition, the Special Committee charged with seeking the greatest price for the Stevens shareholders, was disbanded.

After considering all the facts surrounding the standstill agreement, the court finds as follows:

1. Neither Drexel nor Farley were parties to the standstill agreement.

2. The present transaction (Farley's tender for West Point shares) was not contemplated by the standstill agreement and that agreement and its conditions are not applicable to either Drexel or Farley in the present context.

3. The purpose and/or reason for the agreement between the Special Committee and Odyssey was to control the auction bidding for Stevens. Once the bidding process was completed and Stevens ceased to be a publicly traded corporation, the purpose for the agreement and its conditions ceased.

4. The Special Committee/Odyssey Standstill merged into either or both the March 14 Merger Agreement or the Settlement Agreement between West Point and Odyssey.

5. There has been no showing that either Drexel, or derivatively, Farley, used any confidential information obtained by Drexel in connection with the Odyssey/Stevens transaction in the present transaction.

Based on the above findings, the court determines that West Point has failed to show a substantial likelihood of success on the merits and therefore West Point's request for injunctive relief on this issue is DENIED.

## THE MARGIN REGULATION CLAIMS

West Point asserts that Farley's complex financial plan for funding its $1.57 billion tender offer is in violation of margin regulations promulgated by the Federal Reserve Board under Section 7 of the Exchange Act. *See* Regulations G, T, U and X, 12 C.F.R. §§ 207, 220, 221 and 224, respectively. In addition, West Point asserts that Farley's failure to adequately disclose such alleged violations in its Schedule 14D–1 violates Sections 14(d) and 14(e) of the Exchange Act, 15 U.S.C. §§ 78n(d) and 78n(e).

■ As a threshold matter, this court must determine whether there exists an implied right of action by a private plaintiff to assert a margin claim. In the absence of any binding authority in the Eleventh Circuit, this court feels compelled to follow the greater weight of authority holding that no such private cause of action exists. *See Bennett v. United States Trust Co.*, 770 F.2d 308, 311–13 (2d Cir.1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986); *Walck v. American Stock Exchange, Inc.*, 687 F.2d 778, 788–89 (3d Cir.1982), *cert. denied*, 461 U.S. 942, 103 S.Ct. 2118, 77 L.Ed.2d 1300 (1983); *Stern v. Merrill, Lynch, Pierce, Fenner & Smith*, 603 F.2d 1073, 1074–93 (4th Cir. 1979); *Gilman v. FDIC*, 660 F.2d 688, 691–93 (6th Cir.1981); *Bassler v. Central Nat'l Bank*, 715 F.2d 308 (7th Cir.1983); *Utah State Univ. v. Bear Stearns & Co.*, 549 F.2d 164, 169–70 (10th Cir.1977), *cert. denied*, 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d

176 (1977). *See also First Alabama Bancshares v. Lowder* [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) Para. 98,015 (N.D.Ala., May 1, 1981). *But see Shull v. Dain, Kalman & Quail, Inc.*, 561 F.2d 152, 156 (8th Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978) (implied right of action for damages by an investor against a broker); *Koppers Co. v. American Express Co.*, 689 F.Supp. 1371 (W.D.Pa.1988) (preliminary injunction issued for margin violation).

While this court follows the authority that no standing exists for a private cause of action, the showing made by West Point indicates that Farley's financing is substantially suspect and may be a violation of the margin requirements. Both the interests of the parties and the public seem to indicate the need that the proposed financing plan receive the serious scrutiny of the appropriate regulatory agency charged with enforcing the margin requirements.

▪ Despite West Point's lack of standing to directly assert a margin violation, West Point clearly has standing to assert a failure to adequately disclose the alleged margin violations. *See Pargas, Inc. v. Empire Gas Corp.*, 423 F.Supp. 199, 242 (D.Md.1976), *aff'd*, 546 F.2d 25 (4th Cir. 1976).

Sections 14(d) and 14(e) of the Exchange Act, 15 U.S.C. §§ 78n(d), 78n(e), require disclosure of all material facts in connection with a tender offer. The purpose of such disclosure requirements is to "insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information...." *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 59, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975). Sections 14(d) and 14(e) require the disclosure of all "material information" whether or not disclosure of such is specifically mandated. *See Revlon, Inc. v. Pantry Pride, Inc.*, 621 F.Supp. 804, 808 (D.Del.1985); SEC Release No. 33–5844 [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) Para. 81,-256, at 88,379 n. 22 (July 21, 1977).

▪ This duty to disclose is not, however, an unlimited duty. Where a good faith dispute exists as to facts or an alleged legal violation, the law only requires disclosure of the dispute. *See Warner Communications, Inc. v. Murdoch*, 581 F.Supp. 1482, 1502 (D.Del.1984); *Avnet, Inc. v. Scope Industries*, 499 F.Supp. 1121, 1124–26 (S.D.N.Y.1980).

In the specific context of disputes alleging violations of the margin rules, courts have generally held that disclosure of the existence of a good faith dispute and the possible outcome of an adverse decision in that dispute is sufficient. *See City Capital Assoc. Ltd. Partnership v. Interco, Inc.*, 696 F.Supp. 1551, 1556 (D.Del.1988); *Duro–Test Corp. v. TCA–IV Ltd. Partnership*, C.A. No. 87–4418, transcript at 15 (D.N.J. Dec. 9, 1987) (unpublished bench order).

▪ After reviewing Farley's Schedule 14D–1 disclosure and the amendments thereto, the court finds that Farley has adequately disclosed the potential effect of the alleged margin violations. *See* Offer to Purchase at 44; Amendment 2 to Farley's Schedule 14D–1 filing (copy of West Point's complaint). *See also City Capital Assoc. Ltd. Partnership v. Interco, Inc.*, 696 F.Supp. 1551, 1557 (D.Del.1988); *Duro–Test Corp. v. TCA–IV Ltd. Partnership*, C.A. No. 87–4418, transcript at 14–15 (D.N.J. Dec. 9, 1987) (unpublished bench order).

In light of the foregoing, West Point's motion for an injunction on this issue is DENIED.

### THE RIGHTS PLAN CLAIM

▪ The Rights Agreement, generally referred to as a "poison pill," as amended, provides that the rights issued as of November 23, 1987 entitle all holders, except the holder of 10% or more of West Point's stock (an "Acquiring Person"), to exercise the rights when triggered to purchase, in lieu of preferred stock, additional West Point common stock having a market value equal to twice the $90 exercise price of the right. (In this instance the shareholder may purchase 3.75 shares of common stock, valued at $48 per share for $90.) This so-called "flip-in" provision is designed to dilute the voting rights and equity posi-

tion of an Acquiring Person seeking to gain control of the corporation. In addition to the flip-in provision, the West Point Board has adopted an "Exchange Option" whereby at a time after a person becomes an Acquiring Person and prior to the point such Acquiring Person acquires 50% or more of the company's stock, the Board, at its option, may exchange all or part of the outstanding and exercisable rights (those rights held by stockholders other than the Acquiring Person whose rights have become void) for West Point Common Stock at the rate of one share per right.

Farley asserts that the flip-in and exchange provisions unlawfully discriminate among shares and are therefore an *ultra vires* act of the Board, such being null and void. At the outset of the court's discussion, the court notes the existence of a split of authority concerning the treatment of flip-in provisions.

After examining the statutes involved and considering the available precedent on both sides of the issue, the court finds no authority in either the state law or West Point's Articles of Incorporation which authorize the provisions of the Rights Plan here at issue. The court further finds that the flip-in and exchange provisions operate to effect a discrimination among shareholders of the same class or series. Under either plan the voting rights and the equity position of an Acquiring Person are diluted upon a triggering event. This discriminatory dilution is prohibited by O.C.G.A. § 14–2–80(a).

The Court finds that Farley is likely able to show the action of the West Point Board in adopting the discriminatory flip-in and exchange provisions to be contrary to the present law and therefore an *ultra vires* act which is null and void.

The court finds that in addition to Farley's likely success on the merits of its claim that Farley will suffer irreparable harm should an injunction not issue. Absent the requested relief Farley's tender offer, in light of business realities, is not likely to be able to proceed. *See Dynamics Corp. of America v. CTS Corp.,* 637 F.Supp. 406, 419 (N.D.Ill.), *aff'd* 794 F.2d 250 (7th Cir.1986), *rev'd on other grounds,*

481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987); *Southdown, Inc. v. Moore McCormack Resources, Inc.,* 686 F.Supp. 595 (S.D.Tex.1988); *Amalgamated Sugar Co. v. NL Industries, Inc.,* 644 F.Supp. 1229, 1239 (S.D.N.Y.1986).

In relation to the balancing of the harms, it is apparent that West Point is not entitled to the benefit of illegal defensive mechanisms and that the injunction acts only to remove that illegal barrier. Finally, the court finds no adverse impact upon the interests of the public.

In light of the foregoing, Farley's request for an injunction against the operation of the flip-in and exchange provisions of the West Point Rights Agreement, as amended is GRANTED and West Point is hereby enjoined from in any way implementing or enforcing any of the Rights Plan's flip-in or exchange provisions.

## THE GEORGIA ANTI–TAKEOVER STATUTE CLAIM

█ Farley asserts that the recently enacted Georgia Anti–Takeover Statute, O.C.G.A. § 14–2–236 *et seq.,* is unconstitutional on its face and in its application as it serves to deter or prevent hostile tender offers by giving incumbent management a *de facto* veto over any "business combination" between the company and any "interested shareholder." *See generally,* K. Mason & E. Robinson, *Georgia's Current Antitakeover Law: A Look at Management's New Shield,* 24 Ga.St.Bar.J. 176 (May 1988) (review of New Anti–Takeover statute). Farley attacks the statute on both Supremacy Clause and Commerce Clause grounds.

Under the Georgia statute, the goal of shareholder protection is not achieved through granting individual shareholders' enhanced rights in the face of a tender offer, but rather the power of the board of directors is enhanced by providing them, without shareholder approval, the statutory power to block a second-step business combination for a period of five years absent certain exceptions.

The United States Supreme Court has recently addressed state attempts to regulate tender offers on two occasions, *Edgar v. Mite Corp.,* 457 U.S. 624, 102 S.Ct. 2629,

73 L.Ed.2d 269 (1982) and *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987).

There has also been significant recent adjudications concerning the Delaware business combination statute which while similar in certain respects contains differences which may or may not prove significant. *See BNS, Inc. v. Koppers Co.*, 683 F.Supp. 458 (D.Del.1988); *RP Acquisition Corp. v. Staley Continental, Inc.*, 686 F.Supp. 476 (D.Del.1988); *City Capital Assoc. Ltd. Partnership v. Interco, Inc.*, 696 F.Supp. 1551 (D.Del.1988). One critical issue which was addressed in those determinations and which must be resolved in this proceeding is whether the statutory exceptions to the application of the statutory prohibition on business combinations provide a "meaningful opportunity for success" for a tender offeror in the face of hostile incumbent management. *RP Acquisition Corp.*, 686 F.Supp. at 483.

While both parties have presented expert affidavits on the potential attainability of a business combination under the statute absent the approval of the incumbent board, the affidavits are in sharp and critical conflict both as to their ultimate conclusions as well as to their interpretation of underlying data upon which they are based. As a result of the expedited nature of the proceedings thus far, there has not been adequate time to sufficiently and properly develop the record on this issue. The court notes that in the context of the present motions for injunctive relief the court has not had an opportunity to assess the credibility of the evidence nor to fully pursue or consider other appropriate resources.

In light of the lack of a fully developed record on this point, Farley's motion for a preliminary injunction against the application of the Georgia Anti–Takeover statute is NOT GRANTED AT THIS TIME.

To summarize the holdings of the court, as to Case Number 3:88–cv–113–GET:

1. West Point's motion to preliminarily enjoin Drexel from allegedly violating the Special Committee/Odyssey standstill agreement is DENIED.

2. West Point's motion to preliminarily enjoin Farley from allegedly violating margin and disclosure requirements is DENIED.

As to Case Number 3:88–cv–57–GET:

1. Farley's motion to preliminary enjoin the operation of the flip-in and exchange provisions of the West Point Rights Agreement is GRANTED.

2. Farley's motion to preliminarily enjoin the application of the Georgia Anti–Takeover statute, O.C.G.A. § 14–2–236 *et seq.*, is NOT GRANTED AT THIS TIME.

SO ORDERED.