**CLARENDON GROUP, LTD. and Joel Rocha Garza, Plaintiffs,**

v.

**SMITH LABORATORIES, INC., Defendant.**

**Civ. No. 89–1366–G(CM).**

United States District Court, S.D. Cal.

May 23, 1990.

---

Donald F. Luke, Rogers & Wells, New York City, Jeffrey Isaacs, Procopio, Cory, Hargreaves and Savitch, San Diego, Cal., for plaintiffs.

Mauricio Flores, Pillsbury, Madison & Sutro, La Jolla, Cal., for defendant.

## MEMORANDUM DECISION AND ORDER

GILLIAM, District Judge.

Plaintiffs' and defendants' cross-motions for summary judgment came on for hearing before the Honorable Earl B. Gilliam on December 11, 1989 at 10:30 a.m. in Courtroom 7. Rogers & Wells of New York, by Procopio, Cory, Hargreaves and Savitch (Jeffrey Isaacs and Edward I. Silverman of counsel) represented the plaintiffs. Pillsbury, Madison & Sutro (Kirke M. Hasson and Mauricio Flores of counsel) appeared for the defendants. Having considered the points and authorities and oral argument of counsel, the court issues this memorandum decision and order granting defendants' motion for summary judgment and denying plaintiffs' motion for summary judgment.

## FACTS

This is a cause of action by a group of shareholders for declaratory and injunctive relief regarding the validity of a "poison pill" plan adopted by the board of directors of defendant corporation. The plaintiffs allege that the poison pill violates the Articles of Incorporation of defendant corporation, and therefore its adoption by the Board was an *ultra vires* and invalid act.

The plaintiffs in this case are Clarendon Group, Ltd., and its president, Joel Rocha Garza. Clarendon Group is a Bermuda corporation made up of shareholders who, at the time of the hearing, collectively owned approximately 1,200,000 shares, or 9.4 percent of the stock in defendant Smith Laboratories, Incorporated ("Smith Labs"). Smith Labs is engaged in the manufacture, sale and rental of medical and surgical products through a wholly-owned subsidiary corporation. The plaintiffs are citizens of Mexico and Bermuda. Defendant Smith Labs is a corporation organized and existing under the laws of Illinois, but with its principal offices in San Diego. Smith Labs is governed by its Articles of Incorporation ("Articles"), dated July 25, 1979, with the latest amendments dated April 23, 1984.

Article V, paragraph 2 of the Articles states:

No holder or owner of shares of the corporation, as such holder, shall have any preemptive or preferential right to purchase or subscribe for or to have offered to him for subscription any shares of any class of the corporation, whether now or hereafter authorized, nor shall any holder of any shares of the corporation, as such holder, have any preemptive or preferential right to purchase or subscribe for any obligation or security which the corporation may issue or sell that shall be convertible into, or exchangeable for, any shares of any class of the corporation or to which shall be

attached or appended any warrant or warrants or other instrument or instruments that shall confer upon the holder or owner of such obligation or security the right to subscribe for, purchase or otherwise acquire any shares of any class of the corporation.

This single sentence, a classic illustration of the cautious and superfluous construction for which lawyers are famous, is the center of the instant struggle over the poison pill.

On January 30, 1989, Smith Labs' board, allegedly without prior notice or approval, adopted a "Rights Plan," better known in the corporate community as a type of poison pill.[1] Pursuant to the poison pill, Smith Labs declared a dividend of one "right" for each outstanding share of common stock owned by its shareholders of record at the close of business on February 10, 1989. However, under the so-called "flip-in" provision of the poison pill, once a stockholder becomes either an "adverse person" or "acquiring person," then each holder of a right, *except* the adverse person or acquiring person, immediately becomes entitled to purchase one additional share for each right at approximately one-half the market price. An "adverse person" is any person who becomes the "beneficial owner" of ten percent or more Smith Labs' outstanding shares and who has been deemed by the Board to be adverse. An "acquiring person" is any person who becomes the "beneficial owner" of more than twenty percent of Smith Labs' outstanding shares, and no further Board determination is necessary. The poison pill defines "beneficial owner" to include any person who owns, directly or indirectly, shares of common stock, has the right to dispose of

shares of common stock, or has an agreement with another person for the purpose of acquiring, holding, voting or disposing of shares of common stock. Under this definition, each individual member of the Clarendon Group is a beneficial owner of any and all Smith Labs shares owned by any other member of the group.

Neither side disputes the actual provisions of the poison pill. However they each vigorously dispute the good intentions of the other. The plaintiffs allege that the poison pill was adopted specifically to dilute the equity interest of any shareholders who accumulated shares to challenge the proposed merger of July, 28, 1989 between Smith Labs and International Power Machines. (The merger rumors continued after July, but the merger had apparently not taken place at the time of this hearing.) The plaintiffs allege that they had planned to fight the merger because it was "ill-conceived" and "would have [had] a substantial adverse effect on Smith Labs and its shareholders." The plaintiffs filed suit on September 11, 1989, seeking equitable relief, including a declaration that the "Rights Plan" violated Article V, paragraph 2, above and therefore was an invalid act by the Board.

The defendants argue that the poison pill was validly adopted by the Board to protect its shareholders from hostile takeovers by predatory corporate raiders seeking to reorganize and "bust-up" the company to obtain a quick profit. The defendants allege that the plaintiffs are the stereotypical corporate raiders who plan a hostile takeover and have a history of plundering corporations and filing fraudulent securities disclosures to hide their takeover attempts. The

---

1. Poison pills come in many shapes and sizes, but they are an invention of the 1980s used primarily by corporate boards as a defensive measure to fight off hostile takeover attempts. Poison pills generally work by giving "friendly" shareholders options to purchase the corporation's stock at a bargain price once a "hostile" shareholder has purchased a significant number of shares in the corporation or made a tender offer to purchase a significant number of shares. The hostile shareholder is then frustrated at her attempt to acquire a controlling interest in the corporation, because once she obtains a significant number of shares, many other stockholders will exercise their option to purchase more stock at below market value, subsequently diluting her percentage interest in the corporation. The hostile shareholder is further deterred from her takeover attempt because every new share that is sold at the cheap price devalues all shares, including her own, making the venture less profitable. *See generally* Balotti & Finkelstein, *Del. Law of Corps. & Bus. Orgs.,* § 6.30 (1989); R. Clark, *Corporate Law* §§ 13.-61–13.63 (1986).

defendants have raised a number of equitable defenses, including "unclean hands."

## DISCUSSION

■ Smith Labs is an Illinois corporation. Under Illinois law, a corporation may enact a poison pill except where it violates the corporation's articles of incorporation. The relevant Illinois statute provides:

[E]xcept as otherwise provided in the articles of incorporation, a corporation may create and issue, whether or not in connection with the issue and sale of its shares or bonds, rights or options entitling the holders thereof to purchase from the corporation, upon such consideration, terms and conditions as may be fixed by the board, shares of any class or series.... The terms and conditions of such rights or options may include, without limitation, restrictions or conditions that preclude or limit the exercise, transfer or receipt of such rights or options by any person or persons owning or offering to acquire a specified number or percentage of the outstanding common shares or other securities of the corporation, or any transferee or transferees of any such person or persons, or that invalidate or void such rights or options held by any such person or persons or any such transferee or transferees....

Ill.Rev.Stat. ch. 32, par. 6.05 (1990) (including amendments by P.A. 86–126, section 1, P.A. 86–464, section 1 and P.A. 86–1028, section 2–15). The statute specifically states that it ratifies poison pill plans enacted before the Act, but that it does not affect the rights and fiduciary obligations of a board of directors creating such a plan. *Id.*

Most of the new take-over defensive measures, including poison pills, have been challenged by shareholders or tender offerors who have argued that the measures violated state or federal securities regulations or that the board of directors violated their common-law fiduciary duties of care or loyalty by enacting such measures. *See, e.g., Dynamics Corp. of America v. CTS Corp.,* 805 F.2d 705 (7th Cir.1986); *West Point–Pepperell, Inc. v. Farley Inc.,* 711 F.Supp. 1088 (N.D.Ga.1988); *CRTF Corp. v. Federated Dept. Stores,* 683 F.Supp. 422 (S.D.N.Y.1988). The plaintiffs here make no such allegations. They have not challenged the validity or constitutionality of the Illinois poison pill statute. Nor do they contend that the statute does not apply to the poison pill created by Smith Labs. While they mention some allegations of bad faith in their briefs, the plaintiffs have not stated a claim for breach of fiduciary duty against the board members. They have invoked this court's diversity jurisdiction and brought before it only a single, very narrow issue: whether the instant poison pill violates Smith Labs' Articles of Incorporation and is therefore invalid.

■ Under Rule 56(c) of the Federal Rules of Civil Procedure, a moving party is entitled to summary judgment where the non-moving party cannot make a showing that there is a genuine issue of any material fact and the pleadings, affidavits and other papers establish that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The Articles of Incorporation are a contract and must be construed the same as any contract: in accordance with the document's clear language. *Stroh v. Blackhawk Trading Corporation,* 48 Ill.2d 471, 272 N.E.2d 1 (1972); *Vigilante v. National Bank of Austin,* 106 Ill.App.3d 820, 62 Ill.Dec. 626, 436 N.E.2d 652 (Ill.App. 1982). Construction of the Articles is thus a question of law for the court, and it is the plain meaning of the words used in the contract that governs its interpretation. *Vigilante, supra; see also Donaldson v. Gordon,* 397 Ill. 488, 74 N.E.2d 816 (1947).

■ The plaintiffs contend that the language in the Articles stating that no shareholder "shall have any preemptive or preferential right to purchase or subscribe for or to have offered to him for subscription any shares of any class of the corporation" prohibits the poison pill. Plaintiffs argue that the essence of this poison pill is that it creates preferences and relative rights between shareholders and therefore it clearly

violates the Articles provision cited above. The defendants contend that this provision was drafted solely to prohibit "preemptive rights," those rights that a shareholder has to purchase newly issued stock in order to maintain his or her percentage ownership of the corporation. *See generally* 11 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 5135, *et seq.* (rev. perm. ed. 1986). Therefore, defendants contend that the Articles provision has no relevance to poison pills, especially since it was drafted in 1979 before poison pills came into existence.

The plaintiffs concede that a prohibition of preemptive rights does not affect the board's ability to enact a poison pill, since the two issues are unrelated. However, the plaintiffs' argue that the Articles intended to prohibit more than just preemptive rights, because the Articles also used language prohibiting any "preferential right[s] to purchase." Plaintiffs argue that preemptive right is a term of art which stands alone, therefore the additional language must have been included to add something to the prohibition of preemptive rights.

The court is unconvinced by plaintiffs' argument. It is true that "preemptive right" is a term of art commonly used in the corporate law field. *See, e.g.* Balotti & Finkelstein, *supra* § 5.12; R. Clark, *supra* § 17.1.4; 11 W. Fletcher, *supra* § 5135. However, a preemptive right is preferential in nature. A shareholder who has a preemptive right gets a preference to purchase newly issued shares, under certain conditions, over any other potential buyers. Therefore, it is not a coincidence that a leading treatise on corporate law makes several references to a "preemptive right" as a type of "preference" or "preferential right." [2] Smith Labs, in their Articles, could have used very simple language to prohibit preemptive rights without any reference to "preference" or "preferential," [3] but a leading corporate formbook has one example provision prohibiting preemptive rights that is quite similar to the one at issue.[4]

In 1979 when Smith Labs was incorporated, shareholders in a corporation were granted preemptive rights by the common law of Illinois. *Elward v. Peabody Coal Co.*, 9 Ill.App.2d 234, 132 N.E.2d 549, 552 (1956); *see also Joyce v. Joyce Beverages, Inc.*, 571 F.2d 703, 705–06 & n. 1 (2nd. Cir), *cert. denied*, 437 U.S. 905, 98 S.Ct. 3092, 57

**2.** *See, e.g.* 11 W. Fletcher, *supra* § 5135 (defining a preemptive right: "It is the settled general rule ... that when a corporation issues additional capital stock ..., stockholders at the time of the issuance have the right, *in preference to any other persons, and as between themselves,* to subscribe for or purchase the new stock in proportion to the number of shares of the original stock held by them respectively...."), § 5135.1 ("Apart from any *preemptive or preferential rights* which stockholders may have, they have additional rights with respect to the issuance of authorized but unissued stock and to shares which the corporation has acquired and carries in its treasury...."), § 5138 (describing terms and conditions of exercising a preemptive right: "The *preferential right of existing shareholders* is not dependent upon demanded by them and an offer to subscribe, especially where it would be useless."), § 5140 (A stockholder's *right to a preference in subscribing for or purchasing the* new stock, ... may be sold or assigned by the shareholder."), § 5141 ("If the *right to a preference* in subscribing for new stock is denied to any shareholder by the corporation, an action

may be maintained against it to recover damages.") (emphasis added each occasion).

**3.** *See, e.g.* Balotti & Finkelstein, *supra* Form 1.12 ("The holders of the Common stock shall have no preemptive rights to subscribe for any shares of any class of stock of the Corporation whether now or hereafter authorized."); Fletcher, *Corporate Forms* § 1130 (4th ed. 1982) (giving several examples).

**4.** The first example in Fletcher, *Corporate Forms*, section 1130 provides:

No holder of shares of the capital stock of any class of the corporation shall have any preemptive or preferential right of subscription to any shares of any class of stock of the corporation, whether now or hereafter authorized, or to any obligations convertible into stock of the corporation, issued or sold, nor any right of subscription to any thereof other than such, if any, as the board of directors, in its discretion, may from time to time determine and at such price as the board of directors may from time to time set....

L.Ed.2d 1135 (1978). Corporations were granted the power to limit or deny preemptive rights in their articles of incorporation. Ill.Rev.Stat. Ch. 32, par. 6.50.[5] This legal context is important to determining the purposes of the contested Articles provision. Smith Labs had to include a provision such as Article V, section 2 if it wanted to prohibit preemptive rights. Given the context of Illinois law in this area and the language used in the provision, Smith Labs could have drafted the provision only to prohibit preemptive rights, and the court would have to unduly strain the provision to determine that it prohibits more.

The court therefore holds as a matter of law that Article V, section 2 prohibits preemptive rights and nothing more. Because the court finds that in this context the provision is not ambiguous, it will not consider factual evidence from either party regarding the intent of the drafters when they wrote the provision. The court holds that the prohibition on preemptive rights prevents Board discrimination between shareholders and non-shareholders regarding the purchase of newly issued shares, and it does not prevent the discrimination between and among shareholders which is at issue here.[6] The court therefore finds that the Smith Labs board of directors did not violate Article V, section 2 when it enacted the poison pill, and therefore the act was not *ultra vires*.

For the foregoing reasons, the court grants the defendants' motion for summary judgment and denies the plaintiffs' motion for summary judgment. The clerk is hereby ordered to enter judgment for defendant on plaintiffs' complaint.

IT IS SO ORDERED.

**5.** Illinois law has subsequently changed to abolish preemptive rights in corporations formed after January 1, 1982, unless the corporation affirmatively grants them in their articles. P.A. 83–1025, article 6 (amending Ill.Rev.Stat. Ch. 32, par. 6.50).

**6.** Preemptive rights give shareholders a preference in buying newly issued stock over non-shareholders, thus they discriminate against non-shareholders in favor of shareholders. *See Bank of New York v. Irving Bank Corp.,* 142 Misc.2d 145, 536 N.Y.S.2d 923, 925 (Sup.Ct.N.

Y.), *aff'd without opinion,* 143 A.D.2d 1073, & 1075, 533 N.Y.S.2d 412 (1st Dep't 1988) (citing 3 White, *New York Corporations,* § 622.01); Balotti & Finkelstein, *supra* § 5.12. The "flip-in" provisions of poison pills give preferences to certain shareholders and deny them to others, thus they discriminate between certain types of actual shareholders. *See Dynamics Corp. of America, supra* 805 F.2d at 718; *West Point–Pepperell, supra,* 711 F.Supp. at 1095; *Minstar Acquiring Corp. v. AMF Inc.,* 621 F.Supp. 1252, 1258 (S.D.N.Y.1985).